IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| TOMMIA DEAN,<br><br>**Plaintiff**<br><br>v.<br><br>SAMUEL S. OLENS, EARL EHRHART, NEIL WARREN, SCOTT WHITLOCK and MATT GRIFFIN,<br><br><br>**Defendants.** | CIVIL ACTION FILE NO. _____ |

## COMPLAINT

COMES NOW TOMMIA DEAN ("Plaintiff" or "Ms. Dean") and files this Complaint against Samuel S. Olens ("Olens"), Earl Ehrhart ("Ehrhart"), Neil Warren ("Warren"), Scott Whitlock ("Whitlock") and Matt Griffin ("Griffin") (collectively "Defendants"):

### PARTIES, VENUE AND JURISDICTION

1.

This action is brought pursuant to 28 U.S.C. §§ 1983 and 1985, and this Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331.

2.

Plaintiff Tommia Dean is a citizen of the State of Georgia and resides in Fulton County, Georgia.  Ms. Dean is a sophomore at Kennesaw State University ("KSU").

3.

Defendant Olens is a citizen of the State of Georgia and resides in Cobb County, Georgia.  Olens is the former President of KSU.

4.

Defendant Ehrhart is a citizen of the State of Georgia and resides in Cobb County, Georgia.  Ehrhart is a member of the State of Georgia House of Representatives and represents District 36.

5.

Defendant Neil Warren is a citizen of the State of Georgia and resides in Cobb County, Georgia.  Warren is Sherriff of Cobb County.

6.

Defendant Scott Whitlock is a citizen of the State of Georgia.

7.

Defendant Matt Griffin is a citizen of the State of Georgia.

8.

This Court has personal jurisdiction over each of the Defendants and venue in this Court is proper under 28 U.S.C. §§ 1391.

# FACTS

9.

During pre-season football games in 2016, San Francisco Forty-Niners quarterback Colin Kaepernick refused to stand during the playing of the national anthem, instead kneeling to protest police brutality against black Americans. Explaining why he would not stand during the national anthem, Kaepernick stated: "There are a lot of things that are going on that are unjust [that] people aren't being held accountable for. And that's something that needs to change. That's something that this country stands for – freedom, liberty, justice for all. And its' not happening for all right now."

10.

Kaepernick's actions drew angry disapproval but also praise. One writer stated: "The quietness of his action invited loud disapproval." Kareem Abdul Jabber described Kaepernick's actions as deeply patriotic:

> Patriotism isn't just getting teary-eyed on the Fourth of July or choked up at war memorials. It's supporting what the Fourth of July celebrates and what those war memorials commemorate: the U.S. Constitution's insistence that all people should have the same rights and opportunities and that it is the obligation of the government to make that happen. When the government fails in those obligations, it is the responsibility of patriots to speak up and remind them of their duty.

11.

In the 2017 season, the issue became inflamed again across the Nation, and hundreds of NFL players again began kneeling during the national anthem.

12.

Also in September, 2017, the cheerleaders at KSU, including Plaintiff Dean, began discussing amongst themselves whether they too should kneel during the national anthem.  Kneeling during the national anthem had not become an issue for college football players, for the simple reason that teams typically stay in their locker rooms until the anthem is over.   However, cheerleaders at KSU and other schools in the region (such as Georgia Tech the University of Georgia) would always remain on the field during the playing of the anthem.  The KSU cheerleaders learned that other college cheerleaders had knelt during the playing of  national anthem, and decided, after prayer and discussion, that they would do the same.

13.

During the second home game of the KSU football season on Saturday, September 30, 2017, Ms. Dean and four other KSU cheerleaders knelt during the playing of the national anthem.

14.

Defendant Olens, at the time the President of KSU, did not attend the

September 30 football game, but learned from other KSU officials later that day that the cheerleaders had knelt during the national anthem.

15.

When Olens learned that the cheerleaders had knelt during the national anthem, he emailed KSU Vice President for Student Affairs K.C. White and told him that he was concerned about the cheerleaders' protest and directed Dr. White to schedule a meeting with the cheerleaders the following week.

16.

At the time, Olens was aware that the cheerleaders had a First Amendment right to kneel during the national anthem.

17.

Olens also was aware of KSU policy, which specifically protects freedom of expression, even if the expression contradicts "personal views of university employees and students," and directs members of the faculty, staff and student body to refrain from "behaviors that threaten the rights, freedoms and respect every individual deserves."  KSU Freedom of Assembly and Expression Policy (Student Handbook, 2015-2016, and 2018-2018 draft, available at catalogue.kennesaw.edu/index).

18.

Olens also was aware of the policy of the Board of Regents of the State of Georgia, which provides: "The rights guaranteed by the First Amendment, including the right to free speech, free expression, free exercise of religion, and the right to assemble peaceably are of the utmost importance, and the University System of Georgia (USG) is committed to protecting those rights." The policy of the Board of Regents states further: "Any parameters on the time, place and manner of expression must not be based on the content of the expression." (Board of Regents Policy Manual, Section 6.5, available at www.usg.edu/policymanual/section6/C2653).

19.

The next day, October 1, 2017, Defendant Ehrhart called Defendant Whitlock, the Senior Assistant Athletic Director of KSU ("Whitlock"), and told Whitlock that the cheerleaders should not be allowed to kneel during the national anthem.

20.

On October 2, 2017, Olens attended a meeting of the presidents of the University System of Georgia. During the meeting, the University System Office staff relayed to the University System of Georgia presidents, including Olens, advice from the State of Georgia Attorney General's Office that, pursuant to the First Amendment, students could not be prohibited from

kneeling during the national anthem so long as the expression was not disruptive. The presidents were further informed that any action relating to the issue should be discussed with the University System Office prior to implementation.

21.

Also on October 2, 2017, Ehrhart called Olens and told him that cheerleaders should not be permitted to kneel during the national anthem and that any cheerleaders who continued to kneel should be removed from the team. Either during this phone call or another communication, Olens assured Ehrhart that the cheerleaders at KSU would not again be kneeling during the national anthem.

22.

Also on October 2, 2017, Defendant Warren, Cobb County Sheriff, called Olens and told him that cheerleaders should not be permitted to kneel during the national anthem.

23.

On the morning of October 4, 2017, Defendant Whitlock and Defendant Griffin, at the time the Interim Athletic Director at KSU, called a meeting with KSU officials Brandon Asciutto (head coach of the cheerleading teams), Josh Baker (Director of Marketing and Fan Expience), Michael DeGeorge (Assistant Athletic Director) and Natasha Koutnk (Graphic Designer).

Whitlock announced that, at the next home game, cheerleaders would not be allowed on the field during the national anthem, but would remain in the stadium tunnel with the mascot. At the meeting, and again following the meeting, Assistant Athletic Director DeGeorge raised concerns about the timing of the change, as the cheerleaders had knelt during the national anthem at the prior week's game.

24.

During the afternoon of October 4, 2017, Interim Athletic Director Griffin met with Olens to obtain permission to make the change to the pre-game routine, explaining that the cheerleaders would no longer be on the field during the national anthem. At the meeting, Olens gave Griffin permission to make the change. The only purpose of making the change was to appease Defendants Ehrhart and Warren.

25.

On Friday, October 6, 2017, Warren again called Olens about the cheerleader kneeling during the national anthem. Olens assured Warren that "it would not happen again." Specifically, Olens told Warren that the cheerleaders would not be on the field during the national anthem.

26.

According to an article published on October 6, 2017, in the Marietta Deaily Journal: "Ehrhart said Attorney General Chris Carr and Olens have

been helpful in the situation and he believes the behavor [that is, kneeling during the national anthem] will not occur at KSU again."

27.

KSU played a home football game the next day, October 7, 2017. Normally, the cheerleaders would run out to the field prior to the start of the national anthem. On October 7, 2017, however, and consistent with Defendant Whitlock's October 4 instructions to the Athletic Department, which had been specifically approved by Olens, representatives of the KSU Athletic Department held the cheerleaders in the tunnel until the national anthem was over, at which time they were allowed to return to the field and cheer for their team.

28.

At no prior home football game in KSU's history had the cheerleaders not been on the field during the playing of the national anthem.

29.

Warren and Ehrhart took credit for their concerted effort in pressuring Olens into not allowing the cheerleaders on to the field. In a text message, Warren stated: "Not letting the cheerleaders come out on the field until after national anthem was one of the recommendations that Earl [Ehrhart] and I gave him [Olens]!" In a text to Warren, Ehrhart stated: "He [Olens] had to be

dragged there but with you and I pushing he had no choice. Thanks for you patriotism my friend."

30.

Ehrhart is the chairman of the House Committee that determines the budget for the University of Georgia System, including KSU. Ehrhart has described himself as "the funding source" of the University System, and has a history of using the power of the purse to bully adminstrators at Georgia state universities into complying with his personal agenda.

31.

Ehrhart's statements to Olens and Warren were not made in furtherance of legislation and did involve any legislative activity.

32.

The pressure that Ehrhart brought upon Olens was not pursuant to any legislation or any legislative activity.

33.

Ehrhart and Warren used their power and influence to create a threatening atmosphere for any groups daring to exercise the privileges and immunities guaranteed by the U.S. Constitution.

34.

In a *Marietta Daily Journal* article that ran October 9, 2017, columnist Dick Yarbrough wrote, "Well, I don't know if you kids have taken any

political science courses yet but the sheriff, any sheriff, is about the last person you want to mess with in any county. Neil Warren is an affable man but your antics have riled him something fierce. . . . Again these guys [Warren and Ehrhart] are very upset with you. Don't say I didn't warn you." The threat of physical harm or unjustified arrest is plain and palpable. On information and belief, Defendants Warren and Ehrhart cooperated with and encouraged Mr. Yarborough to write the article.

35.

In October, 2017, KSU students led protests in support of the KSU cheerleaders.

36.

On October 18, 2017, Dr. Steve Wrigley, Chancellor of the University System of Georgia, directed the Board of Regents' Office of Legal Affairs to conduct a special review of the actions taken at KSU following the football game on September 30, 2017.

37.

As the Board of Regents' review was ongoing, at the next home football game, on October 21, 2017, the cheerleaders were again not allowed on the field during the playing of the national anthem. Four members of the cheerleading team, including Plaintiff Dean, knelt in the tunnel during the playing of the anthem.

38.

On November 8, 2017, under pressure from students, faculty, the press, and the Board of Regents, Olens wrote a letter to Kennesaw students, faculty and staff, stating that he had "decided that at Kennesaw State's next home game on November 11, the pre-game program will be restored to its original format, with the cheerleaders taking the field before the singing of the National Anthem." Olens stated: "While I believe there are more effective ways to initiate an exchange of ideas on issues of national concern, the right to exercise one's freedom of speech under the First Amendment must be protected."

39.

On November 14, 2017, the Office of Legal Affairs of the Board of Regents issued their report ("the Regent's Report"). The Regent's Report states that Olens was aware of the decision to bar the cheerleaders from entering the field during the national anthem "and did nothing to stop the change." The Regent's Report also states that: "President Olens also did not advise the University System Office of the proposed change, though he was instructed to do so earlier that week."

40.

The Regent's Report also addressed Defendants' pretextual reason for forcing the cheerleaders to stay in the stadium tunnel during the national

anthem. The KSU Athletic Department had stated that the decision to keep the cheerleaders in the tunnel during the national anthem was not related to the cheerlearing kneeling, but rather was made to "alleviate a two-minute gap in the pregame music." The Regent's Report states: "Their explanation is called into question, however, by the timing of the change and the fact that those who noticed the gap in pregame music in 2017 thought it was remedied by other means."

## COUNT ONE – SECTION 1983 – DEFENDANTS OLENS, WHITLOCK AND GRIFFIN

41.

The allegations of the previous paragraphs are incorporated by reference.

42.

Kneeling during the national anthem constitutes expressive speech protected by the First and Fourteenth Amendments to the U.S. Consitution.

43.

The actions of Defendants Whitlock and Griffin constituted a conspiracy with Olens to deprive Plaintiff Dean of her constitutional rights guaranteed by the First and Fourteenth Amendments to the U.S. Constitution.

44.

By prohibiting the cheerleaders, including Plaintiff Dean, from taking the field and kneeling during the national anthem, Defendant Olens, Whitlock and Griffin in conspiracy under the pretext of improving the fan experience and acting under color of state law, violated Plaintiff Dean's clearly established constitutional rights of which a reasonable person and government official would have known.

45.

As a result of the conduct of Olens, Whitlock and Griffen, Plaintiff Dean has suffered actual compensable injury, including the onset and increase in migraine headaches and emotional distress over the loss of her constitutional rights an the threat of retaliatory action.

46.

In the alternative to actual compensatory damages, Plaintiff is entitled to an award of nominal damages for the violation of her constitutional rights.

47.

Plaintiff also is entitled to an award of punitive damages because these Defendants' conduct involves recklessness or callous indifference to the federally protected rights of others, including Plaintiff.

## COUNT TWO – KU KLUX KLAN ACT CONSPIRACY- EHRHART AND WARREN

48.

The allegations of the previous paragraphs are incorporated by reference.

49.

Defendant Ehrhart and Warren were participating in a private conspiracy actionable under the Ku Klux Klan Act, 28 U.S.C. § 1985(3).

50.

All of the KSU cheerleaders who knelt during the national anthem are African American, and the purpose of kneeling during the national anthem is to protest police brutality against African Americans.   Defendant Ehrhart and Warren engaged in the conspiracy against Plaintiff because of her race and because of she was protesting police brutality against African Americans.

51.

Defendant Ehrhart and Warren engaged in a conspiracy for the purpose of influencing the state to deprive Plaintiff Dean of her federally protected constitutional rights, took affirmative actions in furtherance of that conspiracy, and succeeded in influencing the state to in fact deprive Plaintiff Dean of her federally protected constitutional rights.

52.

As a result of the conduct of Defendant Ehrhart and Warren, Plaintiff Dean has suffered actual compensable injury, as alleged above.

53.

In the alternative to actual compensatory damages, Plaintiff is entitled to an award of nominal damages for the violation of her constitutional rights.

54.

Plaintiff also is entitled to an award of punitive damages because Defendants' conduct involves recklessness or callous indifference to the federally protected rights of others, including Plaintiff.

WHEREFORE, Plaintiff Tommia Dean prays:

A. For an award of compensatory and nominal damages as determined by the enlightened conscience of the jury;

B. For an award of punitive damages;

C. For an award of attorney's fees;

D. For a trial by jury on all issues so triable; and

E. For such other and further relief as required under the circumstances.

This 5st day of September, 2018.

| | |
|---|---|
| _____ | _____ |
| Randolph A. Mayer | Bruce P. Brown |
| Georgia Bar No. 479350 | Georgia Bar No. 064460 |
| MAYER & HARPER | Bruce P. Brown Law LLC |
| 50 Hurt Plaza SE | 1123 Zonolite Rd. NE, Suite 6 |
| Suite 1640 | Atlanta, Georgia 30306 |
| Atlanta, GA 30303 | (404) 881-0700 |
| (404) 584-9588 | |

PLAINTIFF'S COMPLAINT                     Page 17