**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| TOMMIA DEAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION FILE |
| v. | ) | |
| | ) | NO. 1:18-CV-4224-TCB |
| SAMUEL S. OLENS, EARL EHRHART, | ) | |
| NEIL WARREN, SCOTT WHITLOCK, | ) | |
| and MATT GRIFFIN, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT EARL EHRHART'S BRIEF IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

COMES NOW Defendant Representative Earl Ehrhart ("Rep. Ehrhart") and files this his Brief in Support of Motion to Dismiss Plaintiff Tommia Dean's ("Plaintiff") Complaint as follows:

## I.    INTRODUCTION

Plaintiff alleges Defendant Earl Ehrhart committed a violation of 28 U.S.C. § 1985(3), commonly referred to as the Ku Klux Klan Act (hereafter, "Section 1985(3)"). Section 1985(3) provides recourse against, among other things, a conspiracy by public officials who interfere with a person's civil rights. Importantly, Section 1985(3) does not create a freestanding legal right. Rather, it simply provides an enforcement action in a

federal forum for the deprivation of preexisting rights. To state a claim under Section 1985(3), a Plaintiff must allege four elements:

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*Anderson v. Vanguard Car Rental USA, Inc.,* 304 Fed. Appx. 830, 831 (11th Cir. 2008). The 11th Circuit has also recognized that, for the purposes of satisfying the second element, the plaintiff must show that that the deprivation of rights allegedly suffered was the result of "some racial… invidiously discriminatory animus behind the conspirator's action." *Id.* quoting *Lucero v. Operation Rescue of Birmingham,* 954 F. 2d 624, 628 (11th Cir. 1992).

As explained below, the Plaintiff's complaint fails to set forth a cognizable claim under Section 1985(3).  She fails to set forth any facts showing (a) any constitutional right Rep. Ehrhart attempted to infringe, or (b) that Rep. Ehrhart was aware of her race and acted pursuant to that knowledge.  The allegation that Rep. Ehrhart acted "because of [sic] she was protesting police brutality against African Americans," Complaint ¶ 50, is not sufficient to state a claim under Section 1985(3).

Furthermore, assuming the constitutional right in question is the Plaintiff's First Amendment right of "expressive speech protected by the First and Fourteenth Amendments to the U.S. Constitution," Complaint, ¶ 42, the facts alleged in the Complaint do not establish an infringement on that right. To the contrary, Kennesaw State University ("KSU") was within its rights to restrict the expression of student athletes representing KSU, wearing KSU uniforms, and engaging in KSU-sponsored activities during a KSU event within a restricted area of a KSU owned football stadium. Accordingly, Rep. Ehrhart, in urging KSU to exercise its rights, cannot have engaged in any conspiracy to deprive the Plaintiff, or any other student athletes, of their rights of private expression.

## II. BRIEF HISTORY OF SECTION 1985(3)

Section 1985(3) grew out of the reconstruction period following the Civil War. Though African Americans had been granted emancipation by the 13th Amendment, and at least nominally assured a number of federally protected rights by the 14th Amendment, severe and oftentimes legally sanctioned violence persisted against African Americans for much of the immediate post-war period and beyond. "In the midst of this violence against blacks and their supporters, Congress met to debate the passage of 'An Act to Enforce the Provisions of the Fourteenth Amendment to the Constitution of the United States, and for Other Purposes,' also known as the Ku Klux Klan Act." Michael Scott

Russell, *The Ku Klux Klan Act and the Proper Perspective on the Scope of 42 U.S.C. § 1985(3),* 2 REGENT U. L. REV. 73 (1992).

In light of the increasingly troubling lawlessness then occurring in recently rejoined southern states, Congress was acutely aware of the need to ensure crimes against African American citizens could achieve redress in otherwise hostile legal forums. Since it was clear that the state courts were falling short of the task, Congress desired to bring the federal courts into play. The trouble, however, was in balancing the need to bring federal power to bear against virtually non-existent state enforcement, and the constitutional problem of creating a freestanding federal tort right. As Justice Stewart wrote in a landmark Section 1985(3) decision, "[t]hat the [S]tatute was meant to reach private action does not, however mean that it was intended to apply to all tortious, conspiratorial interferences with the rights of others." *Id.* citing *Griffin v. Breckenridge,* 403 U.S. 88, 101 (1971).

While the violence of the post-civil war period doubtless provided ample rationale for passage of Section 1985(3), it is important to be aware of the debate surrounding the implications of, and general desire to avoid, a freestanding federal tort law. This desire influenced the narrow calculus behind the law's passage and resulted in a text that ultimately relies on the violation of other, preexisting rights in order to achieve vindication under Section 1985(3). "Section 1985(3)… ***creates no rights***. It is a purely

remedial statute, providing a civil cause of action when some otherwise defined federal right – to equal protection of the laws or equal privileges and immunities under the laws – is breached by a conspiracy in the manner defined by the section." *Great Am. Fed. Sav. & Loan Ass'n. v. Novotny,* 442 U.S. 366, 376 (1979) (emphasis added). Moreover, the postwar backdrop also infuses Section 1985(3) with a racial animus requirement,[1] the absence of which destroys an otherwise cognizable claim.

### III.   ALLEGATIONS OF COMPLAINT

At the time of the events giving rise to the Plaintiff's claims, she was enrolled as a student athlete at KSU. (Complaint ¶¶ 2 and 12). She joined the cheerleading squad and, in so doing, occupied a special place of importance among her peers. (Complaint ¶ 12). Each game, the Plaintiff suits up in the uniform required by KSU, she executes the required choreography established by KSU's cheerleading coach, and she otherwise governs herself according to the litany of other behavioral codes of conduct required to be a member of the KSU cheerleading squad.

Recently, the Plaintiff decided to deviate from the long-established conduct of cheerleaders during the pre-game ceremonies. (Complaint ¶ 13). The Plaintiff decided to kneel during the playing of the National Anthem as an act of protest against alleged police brutality against African Americans. (Complaint ¶ 50). The act of kneeling, while

---

[1] The courts have since found that the animus can be against certain protected classes other than race, but that holding does not apply to the Plaintiff's claims.

not particularly incendiary in and of itself, can stir great passion in those who witness it in the context of the playing of our National Anthem. It is, by design, a means by which to draw attention to the perceived shortcomings of our nation. To many, it is an insult to those who have fought, died, or otherwise sacrificed their own personal well-being and fortunes for the collective good of the nation. In either event, the emotions evoked are as strong as they are genuine. Beyond the emotional disturbance elicited by the protest, it also disrupts and distracts from an otherwise carefully choreographed pre-game spectacle.

As could be predicted and likely intended, the Plaintiff's actions drew much ire from Cobb county citizens. Many constituents of Rep. Ehrhart voiced their dissatisfaction to him that a taxpayer-funded university would endorse such a disrespectful act. Rep. Ehrhart was genuinely in agreement with the complaints of his constituents, and felt bound to communicate those complaints to those in power at KSU. Rep. Ehrhart's constituents felt it was not for a state sponsored entity like KSU to cavalierly dismiss and belittle the sacrifices of so many.

KSU President Sam Olens, not Rep. Ehrhart, decided that, in order to solve the problem, *ALL* of the cheerleaders (whether they engaged in protesting or not) would simply be relocated to the stadium tunnels during pre-game ceremonies. (Complaint ¶ 27). None of the cheerleaders who engaged in the protest were disciplined by Olens or

6

anyone in the KSU administration. While relocated to the stadium tunnels, none of the cheerleaders, including Plaintiff, were prevented from kneeling during the National Anthem. (Complaint, ¶ 37). Within a few weeks, and in response to negative feedback from a large contingent of the KSU student body, Olens reversed course and again permitted the cheerleaders to occupy the field during pre-game ceremonies. (Complaint ¶ 38).

### IV.   LEGAL ANALYSIS

The Plaintiff's claim against Rep. Ehrhart in the case at bar suffers several ultimately fatal inadequacies rendering it unfit to survive even the minimal pleading standards of a Rule 12(b)(6) Motion to Dismiss. First, as noted earlier, Section 1985(3) claims depend upon the violation of a preexisting right. The Complaint refers only to conclusory allegations of broad violations of "federally protected constitutional rights." (Complaint, ¶ 51). While Plaintiff generally incorporated all prior allegations by reference, she failed to identify specifically which rights she is referring to in her count against Rep. Ehrhart. She arguably contends that Rep. Ehrhart deprived her of her right to "expressive speech protected by the First and Fourteenth Amendments to the U.S. Constitution" as alleged against Defendants other than Rep. Ehrhart and Sheriff Neil Warren. (Complaint ¶ 42.) As is more fully set forth below, Rep. Ehrhart's actions did not deprive the Plaintiff of any preexisting rights, constitutional or otherwise, and

therefore simply cannot amount to Section 1985(3) violation.[2] Further, even if a court were to accept that Rep. Ehrhart deprived the Plaintiff of a right, which he did not, Rep. Ehrhart lacked the requisite racial animus against the Plaintiff needed to trigger a viable Section 1985(3) claim under 11th Circuit jurisprudence and Plaintiff cannot truthfully plead any facts meeting this element.

## A. THE MOTION TO DISMISS STANDARD.

As a threshold matter, federal courts reviewing a Rule 12(b)(6) Motion to Dismiss must consider whether a complaint contains, "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009), quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007) [internal quotations omitted]. "The plausibility standard is not akin to a 'probability requirement' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 556 at 678. Importantly, "[t]hreadbare recitals of the elements of a cause of actions supported by mere conclusory statements, do not suffice." *Id*. While the facts asserted must be taken as true at the motion to dismiss stage, courts "are not bound to accept as true a ***legal conclusion couched as a factual allegation.***" *Id.* (Emphasis added). To survive a motion to dismiss, Plaintiff must plead enough in the Complaint to allow the

---

[2] By contrast, Rep. Ehrhart has a constitutionally protected right to petition government officials on matters of public and policy concern.

Court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*, 556 U.S. at 678.

## B. WHERE NO RIGHTS WERE VIOLATED, THERE CAN BE NO SECTION 1985(3) ACTION

The First Amendment to the United States Constitution is simultaneously perhaps one of the most well-known yet misunderstood provisions in our nation's founding document. The "freedom of speech," as it is termed in the First Amendment, is a deliberately vague term. Despite the many misguided beliefs surrounding the concept of free speech, the words guaranteeing a person the right freely to speak their mind are neither literal nor absolute. Further, it must be emphasized that while the First Amendment limits government constraints on the speech of *others,* it bears no consequence on the speech of the government itself. Many media pundits, third parties and parties involved in this case have rather uncritically accepted the position taken by Plaintiff that her protest on the field at the KSU football stadium was private speech protected by the Free Speech Clause of the First Amendment. Rep. Ehrhart declined to do so at the time and continues to decline to do so. A closer look at the context surrounding Plaintiff's protest reveals she engaged in conduct outside the protections afforded by the First Amendment.

### 1) ON-FIELD ACTIONS BY STUDENT ATHLETES CONSTITUTE GOVERNMENT SPEECH IN A NON-PUBLIC FORUM

The 11th Circuit recently highlighted the Supreme Court's prescient observation that, "[t]here may be situations in which it is difficult to tell whether a government entity is speaking on its own behalf or is providing a forum for private speech." *Mech v. Sch. Bd. Of Palm Beach Cnty.,* 806 F. 3d 1070, 1071 (2015), citing *Pleasant Grove City v. Summum,* 555 U.S. 460, 470 (2009). In *Mech,* a math tutor seeking to advertise his tutoring business at a high school stadium sued the county school board, arguing the decision by certain schools not to allow his advertisements at their stadiums violated his free speech rights. 806 F.3d 1070 (11th Cir. 2015). The Plaintiff in the case, David Mech, operated several businesses out of the same location. One such business was, indeed, a successful math tutoring service called The Happy/Fun Math Tutor. Another business operated out of that location was a pornographic film production company called Dave Pounder Productions, LLC. Although the school district initially permitted Mech's advertisements, they were removed by several schools when it was discovered that the tutoring service shared a business address with the pornographic production company.

Here, as in *Mech,* we have a situation in which an individual is acting, not in a private capacity, but as a representative of the school.  Any speech, therefore, is not private, but speech on behalf of the government. When the actions of individuals representing a state institution come under the microscope of public and judicial examination, the examiners must be careful to balance the rights of the individual with

the right of the state to be able to express *itself*. This is true whether such expression is neutral, or imbued with certain political, social, or moral undertones.

Understanding that the government has a right to speak, to pronounce, and even advocate for particular positions on issues of social importance is fundamental to understanding the limits of the Plaintiff's claims. Indeed, although the Free Speech Clause "restricts government regulation of private speech; it does not regulate government speech." *Mech*, 806 F. 3d at 1074, citing *Summum,* 555 U.S. at 467. "When the government exercises the right to speak for itself, it can freely select the views that it wants to express." *Id.* [internal quotations and citations omitted]. Importantly, "[t]his freedom includes choosing not to speak ***and speaking through the … removal of speech that the government disapproves.***" *Id.* citing *Downs v. L.A. Unified Sch. Dist.,* 228 F. 3d. 1003, 1012 (9th Cir. 2000) [emphasis added]. Accordingly, our Supreme Court has recognized and endorsed the view that government speech is appropriately regulated through the political process, not the Constitution. *Bd. Of Regents of Univ. of Wis. Sys. v. Southworth,* 529 U.S. 217, 229 (2000). A threshold question that must be answered, then, is whether the Plaintiff's on-field, game time protest constituted government speech. For the reasons that follow, it is abundantly clear that it does.

When considering whether an individual's speech can be characterized as "government speech," the 11th Circuit and its inferior courts have on several occasions

applied a three-part test utilized by the Supreme Court. The test considers 1) whether the type of speech at issue has historically communicated messages from the state; 2) whether reasonable observers would conclude that the state is in agreement with the message or speech being displayed; and 3) whether the state exercises direct control over the messages. *Mech,* at 1074-1075. The 11th Circuit has determined that the three-factors are "not exhaustive," and cautioned that "[w]hether speech is government speech is inevitably a context specific inquiry." *Id.* at 1075. Nevertheless, the three factors of history, endorsement, and control, "provide a useful framework" for analysis. *Id.* Several recent cases provide examples of this analysis.

In considering the relevant three-factor test, the *Mech* court first noted there was a lack of historical relevance of banners and signs at schools as a method of communicating government speech. The court, therefore, could not conclude that they "long have communicated messages from the [government]." *Id.* at 1075. That said, the court diminished the probative value of the historical prong of the test finding that "a long historical pedigree is not a prerequisite for government speech." *Id.* at 1076. Indeed, in one case the Supreme Court went so far as to conclude that a promotional campaign for the beef industry – not historically a mouthpiece for government pronouncements – constituted government speech because "[t]he message … is effectively controlled by the

Federal Government itself." *Id.* citing, *Johanns v. Livestock Marketing Association,* 544 U.S. 550, 560 (2005).

The second factor, whether observers would reasonably believe the government *endorsed* the message, "strongly suggests that the banners are government speech." *Mech* at 1076. The court deemed persuasive the fact that "government property is often closely identified in the public mind with the government unit that owns the land." *Id.* Further, the court found that the governmental nature of the banners was clear on their face. "[E]ach banner bears the school's initials and is printed in school colors." *Id.* They are "subject to uniform design requirements imposed by the schools… [T]he banners are formally approved by and stamped with the imprimatur of [the schools]." *Id.* at 1077 [internal quotations omitted]. Accordingly, the court found the second factor heavily in favor of government speech.

The third factor, whether and to what degree the government exercises control over the message, also cut heavily in favor of the schools. "[T]he schools control the design, typeface, [and] color of the banners." *Id.* at 1078 [internal quotations omitted]. Similarly, "the schools dictate the information that the banners can contain, regulate the size and location of the banners, and require the banners to include the school's initials and the message 'Partner in Excellence.'" *Id.* Lastly, the *Mech* court emphasized that the leadership of the schools – in this case the principals – held final authority for approving

the banners. "This final approval authority allows [the school] to choose how to present itself to the community… [and] ensures that the messages on the banners are 'effectively controlled' by the schools." *Id.* citing *Summum,* 555 U.S. at 473.

The plaintiff in *Mech* countered the "control" factor analysis arguing that school lacked any meaningful control. In support, Mech pointed to the fact that he, and not the school, decided the bulk of the information on the banner, including "the logo, name, phone number and web address…" The court was not persuaded. "[T]he fact that private parties take part in the… propagation of a message does not extinguish [its] governmental nature." *Id.,* citing *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.,* 135 S. Ct. 2239, 2251 (2015).

Another instructive case on the issue of government speech is *Cambridge Christian Sch., Inc. v. Fla. High Sch. Ath. Ass'n,* 2017 U.S. Dist. LEXIS 87298. There, a private Christian high school football team asked to use the loudspeaker at the stadium before the start of the game to lead the fans in a prayer, as was their custom. Their request was denied by the Florida High School Athletic Association ("FHSAA"), a state actor hosting the contest, on the grounds that it violated the Establishment Clause of the First Amendment to the United States Constitution. Thereafter, the FHSAA adopted the policy that would effectively bar use of the PA system for group prayer at FHSAA

events. The high school sued alleging, in pertinent part, that the new policy violated their Free Speech rights.

This district court again applied the three-factor test of history, perception of endorsement, and control to the facts before it. Again, the court found that the historical use of the P.A. system did not weigh in favor of the defendants but nonetheless concluded that "the remaining two factors – endorsement and control – weigh in favor of a finding of government speech." *Cambridge Christian Sch. Inc,* at 23 – 24.

On the issue of endorsement, Cambridge Christian pointed out that it "never requested the public address announcer [provided by FHSAA] to give the prayer, but that it instead sought access to the loudspeaker so that a representative of [the] school could pray over the loudspeaker." *Id.* at 25. This distinction was insufficient. Cambridge Christian's request centered on the right to use the *loudspeaker*, which was government property not otherwise open to private parties. Moreover, it required the government to allow "prayer to be broadcast ***during a government controlled and hosted event***. This would… be perceived as state endorsement of Cambridge Christian's religious message." *Id.* [emphasis added].

The control factor also weighed heavily in favor of the FHSAA. Important to the court was that "the prayer would be broadcast during a school event in a program

established and controlled by the state." *Id.* at 26. Moreover, the control exercised by FHSAA over the event was made plain in numerous ways.

> The FHSAA Administrative Procedures and the Participant Manual outline, among other things, the eligibility and registration procedures for students and schools, qualifications for coaches, what sports will be recognized, how the games will proceed, how tickets to events may be obtained, where spectators may sit, the duration of halftime shows, and what and by whom announcements may be made. The entirety of the circumstances lead to the conclusion that speech over the loudspeaker at the Stadium during the championship game was government speech.

*Id.* at 26 – 27.

Given that both the "perception of endorsement" and "control" factors weighed so strongly in favor of finding use of the loudspeaker a form of government speech, the court concluded the decision to deny a private actor's prayer "is not subject to the Free Speech Clause." *Id.* at 27.

The facts in the case at bar present a clear case of a government entity, KSU, exercising discretion over the type of speech it wishes to make as a government actor. Student athletes occupy a unique position as ambassadors of the universities they represent. They often receive special consideration for admission into the university, and even receive full or partial scholarships in exchange for their decision to play their sport for a particular university. They are afforded significantly higher public exposure than their non-athlete student counterparts, and the public views them as representatives of

the university when they are undertaking sporting activities beyond the four corners of campus. They are accorded special privileges and granted access to facilities that other students and the general public are prohibited from entering. When they engage in their particular sport on behalf of the university, they also more closely associate themselves with the spirit and values of the institution than the general student population. Student athletes are required to wear uniforms and other sport specific gear that identifies and, indeed, celebrates them as representatives of a particular school. As such, the speech they engage in while on the field is subject to significant control by the university to which they belong because, ultimately, the student athlete speaks on behalf of the university.

Similarly, the "perception" prong is strongly in favor of a finding of government speech. As in *Mech,* it is important to note here that "government property is often closely identified in the public mind with the government unit that owns the land." *Mech,* 806 F. 3d at 1076. Plaintiff only claims her rights were violated because she was denied the opportunity to protest *on the field of the KSU football stadium.* The field and the surrounding stadium is government land, owned and operated by, and associated with, an arm of the state. As a result, the Plaintiff's on-field protest carries with it more association with the school itself than it does the particular individual carrying out the protest. As was the case in *Cambridge Christian,* a protest on the field, "which otherwise

is not accessible to private parties… ***during a government controlled and hosted event***… [would] be perceived as state endorsement of [the Plaintiff's] message." Moreover, "[E]ach [cheerleader uniform] bears the school's [name and logo] and is printed in school colors." *Id.* The uniforms, like the banners in *Mech,* are "subject to uniform design requirements imposed by the schools… [and] are formally approved by and stamped with the imprimatur of [the schools]." *Id.* Again, it is not the individual Plaintiff carrying out the protest that onlookers would first and most likely recognize. Rather, they would first see the KSU uniform, and associate the unencumbered act of protest on a restricted, private area of KSU owned property, as being endorsed and ratified by KSU. Because of this, the "perception of endorsement" prong strongly supports a finding of government speech.

The third and final prong, "control," also weighs in favor of a finding of government speech. The actions of student athletes on the field of play are meticulously controlled. For cheerleaders like the Plaintiff, particular choreography is approved ahead of time by KSU officials. Clear boundaries are drawn in determining what sort of on-field conduct is "appropriate" for a representative of KSU. Obscene gestures or compromising positions are not tolerated. Wardrobe requirements are regulated and strictly enforced. Cheerleaders are permitted special access to certain areas of the field that are otherwise off-limits to the public. Similarly, they are constrained by the school

from being on the field of play while gameplay is occurring. While it is true that private individuals ultimately exercise control over the messages they wish to convey with their own bodies, whether through the action of kneeling or otherwise, it is the school that either approves and endorses, or disapproves and rejects, the message. Indeed, as the Supreme Court has already held, "the fact that private parties take part in the… propagation of a message does not extinguish [its] governmental nature." *Walker,* 135 S. Ct. at 2251.

For all the foregoing reasons, on-field actions in state-funded university owned football stadiums by student athletes representing a state-funded university constitute government speech. They are, accordingly, not subject to the Free Speech Clause. Therefore, any actions by Rep. Ehrhart as alleged in the Complaint cannot give rise to a viable Section 1985(3) claim and all the claims against Rep. Ehrhart should be dismissed.

2) **PLAINTIFF DID NOT SUFFER A DEPRIVATION OF ANY LEGAL RIGHT BECAUSE STUDENT ATHLETES' RIGHTS ARE MORE LIMITED THAN THEIR GENERAL STUDENT POPULATION COUNTERPARTS**

Constitutional rights are not absolute. In our system of ordered liberty, even the most sweeping textual prohibitions on government conduct contained in the United States Constitution are subject to reasonable limitations. These limitations are even more pronounced in the context of a student athlete at a college or university. As one

commentator put it, "[t]he First Amendment rights of student athletes are inherently limited, just as their Fourth Amendment rights are less protected than those enjoyed by the general public. Athletes can choose to exercise their right to speak… but such speech will have consequences that may appear to conflict with the First Amendment." Meg Penrose, *Outspoken: Social Media and the Modern College Athlete*, 12 J. MARSHALL REV. INTELL. PROP. L. 509, 523 (2013). Indeed, the Supreme Court has long recognized the diminished rights of student athletes. "By choosing to 'go out for the team,' [student athletes] subject themselves to a degree of regulation even higher than that imposed on students generally." *Veronica Sch. Dist. 47J vs. Acton,* 515 U.S. 646, 657 (1995).

This higher degree of regulation is generally accepted by student athletes either expressly, through contractual agreement, or by their conduct in continuing to participate as a member of the team in face of restricted rights. To be sure, student athletes regularly agree to limit their engagement in otherwise permissible conduct that their non-athlete peers routinely engage in. They voluntarily subject themselves to speech codes, curfews, requirements of "good sportsmanship," and even limitations on access to internet websites and social media services. In short, being a student athlete carries special privileges accompanied by special restrictions. This is well known and well-established. *See, e.g. Wildman v. Marshalltown Sch. Dist.,* 249 F. 3d 768, 771 (8th Cir. 2001) (stating

that schools have the "authority to prohibit the public expression of vulgar and offensive comments and to teach civility and sensitivity in the expression of opinions.")

Courts have previously considered expression restrictions in the context of on-field protests. In *Williams v. Eaton,* for example, several minority football players wanted to wear black armbands in protest of what they considered to be racist policies of Brigham Young University and the Mormon Church more generally. 468 F.2d 1079 (10th Cir. 1972). In response, the school not only denied the athletes the right to wear the armbands but the coach went so far as to dismiss them from the team. The 10th Circuit Court of Appeals found the school was within its lawful authority to dismiss the players and the action "did not violate the First Amendment right of expression of the plaintiffs." *Id.* At 1084.

The case at bar does not involve the kind of career jeopardizing implications that were at issue in *Eaton,* but *Eaton* nevertheless demonstrates the sweeping authority universities can exercise over their athletes. Rather, here, the issue boils down to the question of whether KSU exceeded its lawful authority and violated the Free Speech Clause of the First Amendment by instructing cheerleaders to stay in the stadium tunnel until after the national anthem played. Importantly, KSU did not prohibit the cheerleaders from expressing themselves through an act of protest. The Plaintiff does not dispute that she retained the right to kneel inside the tunnel of the stadium prior to the

start of the game. Indeed, the Plaintiff did exactly that. (Complaint, ¶ 37). Perhaps more importantly, the Plaintiff was not fined, benched, suspended, expelled or the recipient of any disciplinary action whatsoever. Instead, KSU simply declined to provide the Plaintiff with the on-field publicity she desired to have. This, Plaintiff claims, constituted a deprivation of a fundamental right.

Given the restrictions schools are routinely permitted to place on student athletes, it is difficult to see how the Plaintiff can advance the claim that she had a constitutional right to be at a particular place at a particular time, so that her protest could garner the most attention. If a school can ban or limit a student athlete's social media usage, or subject them to speech codes and curfews, or remove them from a team for displaying controversial armbands, surely they can decide the appropriate location for cheerleaders during an extra curricular event hosted by the school and located on school property. The Constitution appropriately grants Americans a great many rights and privileges. Requiring a university to provide the optimal audience for a student's protest during an athletic event, however, is not one of them.

## C. SECTION 1985(3) VIOLATION REQUIRES A RACIAL ANIMUS THAT REP. EHRHART LACKS

As earlier noted, in order to find a Section 1985(3) violation, the alleged violator must demonstrate "some racial or otherwise class-based, invidiously discriminatory animus behind the conspirator's action." *Id.* quoting *Lucero v. Operation Rescue of*

*Birmingham,* 954 F. 2d 624, 628 (11th Cir. 1992). In the case at bar, Plaintiff's sole allegation of racial animus is that "[a]ll of the KSU cheerleaders who knelt during the national anthem are African American, and the purpose of kneeling during the national anthem is to protest police brutality against African Americans.  Rep. Ehrhart … engaged in the conspiracy against Plaintiff because of her race and because of [sic] she was protesting police brutality against African Americans." (Complaint ¶ 50). This, Plaintiff argues, is sufficient to establish the racial animus requirement. Plaintiff is mistaken.

In *Lucero v. Operation Rescue of Birmingham,* the plaintiff represented a class of "patients who are seeking abortions, family planning counselling, and gynecological services…" 954 F. 2d 624, 626 (11th Cir. 1992). There, race was not at issue. Instead, the complaint alleged discrimination by the defendant because the patients were women seeking lawful abortions and abortion related procedures.

*Lucero* involved a series of protests by Operation Rescue of Birmingham, an anti-abortion activist group, which held their protests outside the gynecological office of Dr. Lucero. The complaint alleged a Section 1985(3) violation because, they claimed, the protestors were "motivated by an invidiously discriminatory animus directed at women who seek the services of Dr. Lucero, as a provider of abortions and related medical services." *Id.* The court, however, was unpersuaded.

The 11th Circuit accorded particular weight to the fact that that trial court found, "the [protestors'] animus is directed at the practice of abortion and the concept that its practice is legal.... The animus is against the principle that it is morally and legally right to abort a fetus." *Id.* at 628. Moreover, the 11th Circuit analogized the case to a similarly situated case from the 5th Circuit, *Mississippi Women's Medical Clinic v. McMillan,* 866 F. 2d 788 (5th Cir. 1989). There, the court noted that the protestors,

> do not target their pro-life advocacy at any particular group.  The protestors (who are made up of both men and women) confront and try to persuade to their point of view all groups – men, women of all ages, doctors, nurses, staff, the female security guards, etc…

*McMillan,* 866 F. 2d at 794. Accordingly, the allegedly targeted class (women getting abortions) was, "so under-inclusive as to mischaracterize the dispute." *Id.*

Here, we have a similarly under-inclusive class of allegedly targeted individuals. True, the cheerleaders who protested were African American, but it was the entire team of cheerleaders, regardless of race or ethnicity, who were required to remain in the tunnel during the National Anthem. Moreover, for cheerleaders of any race, color, or creed who decided to protest the National Anthem in a similar manner, the restriction was the same.

Finally, there is no allegation in the Complaint that Rep. Ehrhart was at the game, personally observed the protest or was aware that any of the protestors were African

American. The mere assertion of a legal conclusion disguised as a statement of fact does not survive under *Twombly*.

It is difficult to see how a racial animus can be imputed where, as here, 1) there is no allegation that the alleged conspirator knew the specific races of the individual protestors; 2) there is no allegation that the alleged conspirator was even present to observe the protest; and 3) the action taken against the cheerleaders was uniformly applied to *all* cheerleaders on the squad, regardless of their race or ethnicity, and irrespective of whether they participated in the protest.

For the foregoing reasons, Rep. Ehrhart did not possess, does not possess, and has never possessed the requisite racial animus required for a finding of Section 1985(3) violation.

## V.   CONCLUSION

Section 1985(3) is a limited, remedial, action that relies entirely on the existence of a violation of some other preexisting right. Rep. Ehrhart's actions did not aid or result in the violation of any of the Plaintiff's rights – constitutional or otherwise. Moreover, Rep. Ehrhart plainly lacks the requisite racial animus toward the Plaintiff to find a Section 1985(3) violation. Accordingly, Plaintiff's claims against Rep. Ehrhart should be dismissed with prejudice in their entirety.

Respectfully submitted this 16th day of October, 2018.

TAYLOR ENGLISH DUMA LLP

**/s/ Jonathan D Crumly, Sr.**
Jonathan D. Crumly, Sr.
Georgia Bar No.  199466
Email: jcrumly@taylorenglish.com
Deborah A. Ausburn
Georgia Bar No. 028610
Email: dausburn@taylorenglish.com
R. Wayne Bond
Georgia Bar No. 066759
Email: wbond@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
Email: bjacoutot@taylorenglish.com

1600 Parkwood Circle, Suite 200
Atlanta, Georgia 30339
Telephone: (770) 434-6868
Facsimile: (770) 434-7376

*Attorneys for Defendant Representative Earl Ehrhart*

## CERTIFICATE OF COMPLIANCE

The undersigned attorney hereby certifies, pursuant to L.R. 7.1, ND Ga., that the foregoing **DEFENDANT EARL EHRHART'S BRIEF IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S COMPLAINT** was prepared in accordance with L.R. 5.1, ND Ga. using Times New Roman font, 14 point.

/s/ Jonathan D. Crumly, Sr.
Jonathan D. Crumly, Sr.
Georgia Bar No. 199466
jcrumly@taylorenglish.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| TOMMIA DEAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION FILE |
| v. | ) | |
| | ) | NO. 1:18-CV-4224-TCB |
| SAMUEL S. OLENS, EARL EHRHART, | ) | |
| NEIL WARREN, SCOTT WHITLOCK, | ) | |
| and MATT GRIFFIN, | ) | |
| | ) | |
| Defendants. | ) | |

**CERTIFICATE OF SERVICE**

I hereby certify that I have this day electronically submitted the foregoing **DEFENDANT EARL EHRHART'S BRIEF IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S COMPLAINT** to the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to all counsel of record.

This 16th day of October, 2018.

/s/ Jonathan D. Crumly, Sr.
Jonathan D. Crumly, Sr.
Georgia Bar No.  199466
jcrumly@taylorenglish.com

01307069-3

28