IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| TOMMIA DEAN,<br><br>       **Plaintiff**<br><br>v.<br><br>SAMUEL S. OLENS, EARL EHRHART, NEIL WARREN, SCOTT WHITLOCK and MATT GRIFFIN,<br><br>       **Defendants.** | CIVIL ACTION<br>FILE NO.: 1:18-cv-04224-TCB |

## PLAINTIFF'S RESPONSE TO DEFENDANT EHRHART'S

## MOTION TO DISMISS

Plaintiff Tommia Dean files this Response to Defendant Earl Ehrhart's Motion to Dismiss (Doc. 14).

### SUMMARY OF ARGUMENT

Though the standard under the Federal Rules of Civil Procedure 12(b)(6) and *Iqbal* requires that all allegations in the Plaintiff's Complaint be taken as true, Defendant Ehrhart shows remarkably little interest in the actual allegations stated in the Plaintiff's Complaint.

Despite Defendant's assertion that Plaintiff's Complaint is filled with "legal conclusions" or "conclusory statements," a review of the Complaint shows that it was pled with extensive factual assertions, which, if taken as true as they must, fully support all elements of a 42 U.S.C. § 1985 claim against this Defendant.

Plaintiff asserted that Kennesaw State University ("KSU") at the time of the cheerleaders' kneeling protest had in place policies that protected Plaintiff's freedom of expression and that the KSU student handbook provided that the protections exist even if the expression by the student contradicts "personal views of university employees and students." Furthermore, the handbook directs members of the KSU community from "behaviors that threaten the rights, freedoms and respect every individual deserves" (Complaint, ¶ 17).

The Complaint further details the policies of the University System of Georgia ("USG"), recognizing that rights granted under the First Amendment are of the "utmost importance" and that the USG "is committed to protecting those rights." (¶ 18). The Complaint alleges that it is the policy of the USG to not regulate the time, place or manner of speech based on the "content" of the speech (¶ 18).

The Complaint states that Defendant Ehrhart engaged in a conspiracy with the other Defendants to deprive Plaintiff of her First Amendment rights of protest

and expression (¶ 49). The Complaint provides details of Ehrhart's calls to KSU President Olens and Sherriff Warren, in which Ehrhart and Warren pressured the state official, Olens, into depriving Plaintiff of her constitutional rights (¶¶ 19, 21, 26, 29). In paragraph 29, Plaintiff Dean specifically alleges this Defendant texted to Defendant Warren that, "He [Olens] had to be dragged there but with you and I pushing, he had no choice" and that he thanked Defendant Warren for his "patriotism."

This exchange indicates that all three actors knew the pressure Ehrhart and Warren put upon Olens was applied for the purpose of violating Plaintiff's constitutional rights. Defendants Warren and Ehrhart knew Olens was reluctant to violate the law, acknowledged that they "dragged him there" and believed that because of their power in the community, Olens "had no choice."

The Complaint alleges that Plaintiff and the four other cheerleaders involved in the protest are African American and the purpose of their symbolic speech was to protest perceived police brutality against African Americans (¶ 50). The Plaintiff further alleges that Defendants Ehrhart and Warren engaged in a conspiracy because of Plaintiff's race and the fact that she was protesting "police brutality against African Americans" (¶ 50).

Plaintiff in her Complaint and in her actions tied her protests to the well-publicized protests by professional football players Colin Kaepernick and others against police brutality. (¶¶ 9-11) Plaintiff alleged that this Defendant knew and complained to Defendant Whitlock that Plaintiff and the others should not be allowed to kneel during the national anthem (¶ 19).[1] Plaintiff alleged that Ehrhart called President Olens and told him no cheerleader should be allowed to kneel and any cheerleader who engaged in a protest during the national anthem should be "removed from the team." (¶ 21) [2]

Plaintiff alleged that on October 9, 2017, the *Marietta Daily Journal* published an article by columnist Dick Yarborough, in which Yarborough addressed the cheerleaders directly, stating on personal knowledge, that "these guys [Warren and Ehrhart] are very upset with you. Don't say I didn't warn you." (¶ 34).

Plaintiff alleged Defendant Ehrhart engaged in a conspiracy and took actions in furtherance of a conspiracy. Plaintiff also alleged loss of protected constitutional

---

[1] The national anthem was written by a slaveholder and contains these problematic lines, "No refuge could save the hireling and slave from the terror of flight or the gloom of the grave." F. Scott Key, *Defense of Fort M'Henry*.
[2] After this Complaint was filed, this Plaintiff along with three other kneeling cheerleaders were in fact excluded from the team.

rights (¶¶ 21, 22, 29, 34, 49, 50, 51), actual compensable and punitive damages as well as attorney's fees as a result of this Defendant's wrongful actions. (¶¶ 52-54).

In support of his Motion, Defendant Ehrhart makes three arguments. First, Defendant argues at length that kneeling during the national anthem by cheerleaders constitutes unprotected "government speech." (Doc. 14, pages 9 – 19). As explained below in Part A, this argument – implausible on its face – is contradicted by the evidence and unsupported by case law. In the case relied upon by Defendant, *Mech v. School Board of Palm Beach County,* 806 F.3d 1070 (11th Cir. 2015), a high school prohibited the display on a football field of a banner by a local dentist who had a side business as a porn star. The standard banner design proclaimed that the school was a "partner" of each advertiser and, understandably, the school did not want to be associated with a dentist/porn star. The Court agreed that the high school had the right not to be associated with this business through its advertising banners. The content of the speech was not really at issue.

The facts in the present case involved protest by some of the cheerleaders, but not all, and was connected to the highly publicized actions of NFL players who knelt during the national anthem in protest of unfair police treatment of minorities. The kneeling cheerleaders were all African American. No reasonable person could see the actions of Plaintiff and the others as anything other than the exercise of

their First Amendment right to protest what they saw as injustice. KSU has never claimed that the content of Plaintiff's symbolic speech represented the position of KSU and this Defendant does not make that assertion.

Second, this Defendant argues that in a First Amendment context, student athletes have fewer rights than other students. No case cited supports that broad assertion. Defendant Ehrhart's argument, again, is at war with KSU policy itself, which makes no distinction between students and "student athletes" for purposes of First Amendment protection. In addition, the case relied upon by Defendant, *Veronia School District 47J v. Acton,* 515 U.S. 646 (1995), was a Fourth Amendment case, not a First Amendment case. The trial judge found that because of the communal nature of locker rooms, athletes have fewer expectations of privacy and a school policy of random drug testing in light of perceived problems of illegal drug use, especially among the athletes, was a permissible and reasonable search.

The other two cases that Defendant Ehrhart relies upon, *Wildman v. Marshalltown School District,* 249 F.3d 768 (8th Cir. 2001), and *Williams v. Eaton,* 468 F.2d 1079 (10th Cir. 1972), involved vulgar or disruptive conduct. In this case, there has never been any suggestion by Defendants or KSU or any other person

that the cheerleaders' symbolic speech was vulgar or disruptive in any way whatsoever.

Third, Defendant Ehrhart contends that he lacked the "racial animus" that he claims is required under Section 1985. (Doc. 14, pages 22 to 25). As explained in Part C, below, this argument fails because the text of Section 1985 contains no requirement that the plaintiff prove racial animus and, even if there were such a requirement, the Complaint contains plausible and specific allegations of racial animus. (Complaint, ¶ 50). The implication in Defendant Ehrhart's brief that he did not know the race of the Plaintiff and her fellow protesters is itself "not plausible" and, in any event, should be the subject of discovery.

## A. GOVERNMENTAL SPEECH

The seminal Supreme Court decision in *Tinker v. Des Moines*, 393 U.S. 503, 505 (1969) held that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." The *Tinker* Court explained its reasoning thus, "A student's rights therefore, do not embrace merely the classroom hours. When he is in the cafeteria, *or on the playing field,* or on the campus during authorized hours, he may express his opinions…if he does so without 'materially and substantially interfer[ing] with the requirements of appropriate discipline in the operation of the school' and without colliding with the rights of others." *Id.* at 512-

513 (emphasis supplied). In *Tinker*, the Supreme Court upheld the right of students to wear black armbands at school in protest of the Vietnam War. The holding recognized and upheld the right of similar protest by athletes "on the playing field." As in *Tinker,* the protests in the present case were silent, respectful and not disruptive (except perhaps to those who do not believe in the vigorous debates necessary to a democratic country). Plaintiff made no disrespectful gestures and when she kneeled, bowed her head and placed her hand over her heart, she appeared to be praying for this country to fulfill its best self.

     Ignoring the holding and sweep of the *Tinker* decision, Defendant Ehrhart argues that the Plaintiff's actions constituted government speech, not private speech, and accordingly could be censored by Defendant Olens without violating the First Amendment. Cheerleaders are acting as representatives of the school, Ehrhart contends, and cheerleaders' speech is "speech on behalf of the government." (Doc. 10 at page 10). But unlike the defendants in the cases he relies upon, Defendant Ehrhart is not the government, and there is no evidence that Kennesaw State University or the Board of Regents believe that the symbolic speech of the cheerleaders, whether it is kneeling (or silently praying) during the national anthem should or could be deemed the speech of the University itself.

To the contrary: It was and is the official policy of the Board of Regents that "pursuant to the First Amendment, students could not be prohibited from kneeling during the national anthem so long as the expression was not disruptive." (Complaint, ¶ 20). The Board of Regents' position is obviously the correct one as a matter of law, and is completely inconsistent with Defendant Ehrhart's contention that cheerleaders kneeling during the national anthem constitutes "government speech."

Defendant Ehrhart would wrap himself in the protection of a University rule – that cheerleaders *may or must* be prohibited from kneeling during the national anthem – that has never existed. Plaintiff does not challenge the constitutionality of a University rule or policy. Instead, Plaintiff alleges that, notwithstanding a University policy that should have protected her, Defendant Ehrhart, a private citizen, conspired with the other individual Defendants to deprive Plaintiff of her First Amendment rights.

There is nothing in the case of *Mech v. School Bd. Of Palm Beach County*, 806 F.3d 1070 (11th Cir. 2015), cited at length by the Defendant, that contradicts any of the principles of *Tinker*. The cases address entirely different issues.

The school district in *Mech* rightly felt that, in the context of advertising banners at its high school football field, the school would be too closely identified

with Mech himself, a dentist and porn star. The advertising banners carried the school's initials and colors; the school controlled the design of the banners; and the banners identified the school and the advertiser as "Partners in Excellence". *Id.* at 1076-1078. The school district in *Mech* simply did not want to be associated with Mech, and the Court held that it had the right to protect its brand in the context of commercial speech. The content of the banner was not really at issue.

In the *Walker* case cited by this Defendant, the Supreme Court relied heavily on the long history of Texas license plates being used to project a purely governmental message, *i.e.* the license plate number identifying the owner of the car for public safety purposes, the name "Texas" in large letters, and government messages such as "The Lone Star State." 135 S. Ct. 2239, 2248-2249.

Any private message by the owner of the car was collateral and insufficient to overcome the strong governmental purpose of license plates.

In the present case, Plaintiff and four other African-American cheerleaders knelt in silent protest. Their message was poignant and controversial. They were calling attention to their belief in the wrongful nature of police interaction with minorities in too many encounters in American cities. Their protest was related to and derivative of nationally publicized protests by African-American NFL players during the national anthem at NFL games. The cheerleaders' actions reflected the

value that KSU placed on vigorous and controversial speech under its policies, but no reasonable person could believe that KSU as an institution endorsed the content of the speech. The symbolic speech by Plaintiff and the others was designed to provoke and influence the perspective of the institutions of our society, not represent their views.

### B. FIRST AMENDMENT RIGHTS OF STUDENT ATHLETES

As previously noted in *Tinker*, the Supreme Court specifically protected school athletes' rights of free expression "on the playing fields." Any analysis of the issue must start from that holding by the Supreme Court.

The case of *Veronia School District 47J v. Acton*, 515 U.S. 646 (657) is distinguishable. First, the case was not decided on a motion to dismiss, but by a bench trial in which substantial evidence was taken. The *Veronia* case was also not a First Amendment case, but a Fourth Amendment case involving random drug testing of football players. The Court held that there was a widely observed problem with illicit drug use at the school, especially among athletes, and noted the decreased expectation of privacy because of the athletes dressing and showering together in the locker room. *Id.* at 657. In light of these circumstances, the Court found the testing to be "reasonable" under the Fourth Amendment. *Id.* at 664-665. The analysis was case specific, did not involve First Amendment principles and did

not hold that athletes have fewer First Amendment rights than non-athletes in a school setting.

The case of *Wildman v. Marshalltown School District*, 249 F.3d 768 (8th Cir. 2001) also misses the mark. In that case a member of a girls' basketball team sent a letter to her teammates complaining of the coach, used the word "bullshit" in regard to the coach and implied that the team should band together to force him to make changes. *Id.* at 770. The decision of the Court in favor of the school board was also not on a motion to dismiss, but on summary judgment after a full record had been developed. The Court ruled that though students do have "constitutional rights to freedom of speech or expression," that the school board had the authority to prohibit "the public expression of vulgar or offensive statements." *Id*. at 771. The Court also found that the plaintiff's speech could be considered "insubordinate" under the basketball team handbook and school's handbook for student conduct. *Id.*[3] Nothing in the case suggested that athletes had lesser rights than other members of the student body.

The case of *Williams v. Eaton*, 468 F.2d. 1079 (10th Cir.1972) was also decided after an evidentiary hearing and the receipt of affidavits by the trial court.

---

[3] Ehrhart's brief is filled with statements of purported fact – without any citation – regarding what rights athletes might generally relinquish as a result of being on a team. These arguments have no place in a motion to dismiss.

In this case, several African-American football players wanted to wear black arm bands in the University of Wyoming's game against Brigham Young University. The purpose was to protest what the football players perceived as racist tenets of the Mormon Church. The coach refused to allow the arm bands and, when the players persisted, he tossed them off the team. The players sued.

The case had a complex procedural history, but the Tenth Circuit ultimately decided under *Tinker* principles that wearing the arm bands as part of a protest against the Mormon religion in the context of a football game against a Mormon school constituted "hostile expressions against the religious beliefs of others" and was properly prohibited under *Tinker* as excessively disruptive. *Id*. at 1084. Not only did the Tenth Circuit not rule that athletes had fewer rights than other students, it implicitly re-affirmed *Tinker* principles in the context of athletes.

An odd statement is made on page 21 of Defendant Ehrhart's brief that Plaintiff "retained the right to kneel inside the tunnel of the stadium prior to the start of the game." This reflects a fundamental misunderstanding of speech, expression and protest essential to a vigorous democracy. This country was founded in protest at the Boston Tea Party. There was nothing polite or safe about that event nor in subsequent protests by women at Seneca Falls in 1848, by labor in

the 1890s or by Civil Rights activists in the 1950s and 60s. All of these events made our country better, stronger and more democratic.

As previously noted, KSU policies prohibit restrictions on the "time, place or manner of speech based on the content of the speech." The *Tinker* Court addressed the point explicitly, "Freedom of expression would not truly exist if the right could be exercised only in an area that a benevolent government has provided as a safe haven for crackpots…. [W]e do not confine the permissible exercise of First Amendment rights to a telephone booth or the four corners of a pamphlet, or to supervised and ordained discussion in a school classroom." *Tinker* at 513.

### C. RACIAL ANIMUS

Plaintiff first notes that the phrase "racial animus" is nowhere to be found in the text of 42 U.S.C. § 1985 (3). In the case cited by this Defendant, the quote provided to this Court was incomplete. In *Lucero v. Operation Rescue of Birmingham,* 954 F.2d 624, 628 (11th Cir. 1992), the Eleventh Circuit stated that the plaintiff must show a deprivation of rights under a constitutional provision and some "racial or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirator's action." *Id.* at 628. For some inexplicable reason the phrase "or perhaps otherwise class-based," was left out of Defendant's brief. (Doc. 14, page 2).

This is important because the Supreme Court has pointedly refused to limit the claims under § 42 U.S.C. 1985 (3) to race-based animus. In *United Brotherhood of Carpenters and Joiners v. Scott*, 463 U.S. 825 (1983), the Supreme Court addressed the issue of the scope of § 1985 (3). The Court considered the issue of whether § 1985 (3) extended its protection of political groups such as Republicans or Northerners who came South and were generally supportive of the Freedman to be a "close question." *Id*. at 836. The Court noted the legislative history at the time of passage in favor of a broader coverage of the statute beyond race. *Id.* at 836-837. The Court notably did not resolve the question of whether political affiliations are protected from invidious discriminatory animus through a conspiracy under 42 U.S.C. § 1985 (3), though it ruled against protection of those sharing similar economic views. *Id.* at 837.

In the case of *Means v. Wilson*, 522 F.2d 833 (10th Cir. 1985), the Tenth Circuit allowed the application of §1985 (3) in a non-race case involving complaints of election irregularities in a Native American election dispute. Interference with constitutional voting rights was alleged, and Native American supporters of two different Native American candidates were both plaintiffs and defendants in the case. As noted in the dissent, "Race is not involved in this contest." *Id.* at 842. The Court ruled that the plaintiffs stated a cause of action

under 42 U.S.C. § 1985 (3) in that the group of plaintiffs in the case "were a class against whom…the defendants discriminated because of their class membership." *Id.* at 840. Thus a class that was political and not racial was recognized as protected under § 1985 (3) in this Circuit Court decision.

It is an open question whether animus against Plaintiff because she is a supporter of the "Black Lives Matter" movement – regardless of her race – is actionable under 42 U.S.C. § 1985 (3).

Even if the statute were so limited, there are ample allegations in the Complaint of animus and race-based animus. All of the kneeling cheerleaders were African American. (Complaint, ¶ 50) They were protesting perceived injustices in interactions between police and minorities. *Id.* The kneeling was related to the protests of Colin Kaepernick and other African-American NFL players who kneeled during the national anthem to protest claimed injustices to black citizens at the hands of police around the country. (*Id.* ¶ 9-11) These protests attracted tremendous publicity, and Plaintiff asserts that the connection to the NFL protests is what caused the furious activities by this Defendant and Sheriff Warren to "drag" and "push" President Olens to take the unlawful action he did in removing Plaintiff from the field during the national anthem so she would have no forum for her protected speech. (¶¶ 9-11, 29, 50-52).

The allegations of racial animus in the Complaint easily meet the plausibility standard under *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and the elements of a Section 1985 (3) claim.[4]

## CONCLUSION

In his Motion to Dismiss for Failure to State a Claim, Defendant Ehrhart spends almost no effort in actually analyzing the detailed allegations of the Plaintiff's Complaint. Instead, without a record or discovery, the Defendant argues that he should win on the merits. Such arguments are inappropriate at this stage and therefore Plaintiff asks that this Court deny Defendant Ehrhart's Motion to Dismiss under Fed R. Civ. P. 12 (b)(6).

This 30th day of October, 2018.

/s/ Randolph A. Mayer
Randolph A. Mayer
Georgia Bar No. 479350
Mayer & Harper, LLP
50 Hurt Plaza SE, Suite 1640
Atlanta, GA 30303
(404) 584-9588

/s/ Bruce P. Brown
Bruce P. Brown
Georgia Bar No. 064460
Bruce P. Brown Law, LLC
1123 Zonolite Rd. NE, Suite 6
Atlanta, GA 30306
(404) 881-0700

---

[4] Regarding plausibility, the claim by this Defendant suggesting that he did not know the race of Plaintiff Dean and the other protesters truly strains plausibility. The nature of the protest was widely reported in the press. Sherriff Warren was at the game, and the two exchanged numerous text messages the following week. In any event, this should be a matter for discovery.

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing Brief in Response to Defendant Earl Ehrhart's Motion to Dismiss has been prepared in accordance with the font type and margin requirements of LR 5.1, using font type of Times New Roman and a point size of 14.

/s/ Randolph A. Mayer
Randolph A. Mayer
Georgia Bar No. 479350
Mayer & Harper, LLP
50 Hurt Plaza SE, Suite 1640
Atlanta, GA 30303
(404) 584-9588

## CERTIFICATE OF SERVICE

This is to certify that I have this day caused the foregoing Brief in Response to Defendant Earl Ehrhart's Motion to Dismiss to be served upon all other parties in this action by via electronic delivery using the PACER-ECF system.

This 30th day of October, 2018.

/s/ Randolph A. Mayer
Randolph A. Mayer
Georgia Bar No. 479350
Mayer & Harper, LLP
50 Hurt Plaza SE, Suite 1640
Atlanta, GA 30303
(404) 584-9588
