IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

TOMMIA DEAN,

     Plaintiff,

v.

SAMUEL S. OLENS; EARL
EHRHART; NEIL WARREN;
SCOTT WHITLOCK; and MATT
GRIFFIN,

     Defendants.

CIVIL ACTION FILE

NO. 1:18-cv-4224-TCB

# **O R D E R**

This case comes before the Court on the motions to dismiss for failure to state a claim of Defendants Earl Ehrhart [14] and Neil Warren [23].

## I.    **Background**

In the fall of 2017, Plaintiff Tommia Dean was a cheerleader at Kennesaw State University. On September 30, 2017, she and four other cheerleaders on the KSU team knelt during the playing of the national

anthem while on the field at a KSU home football game. The cheerleaders had decided to do so in solidarity with the practice of some professional football players who kneel during the anthem to protest racial injustice and police brutality. One of the most well-known kneeling protesters is Colin Kaepernick, whose actions inspired Dean and were mimicked throughout the country.

The KSU kneeling caused a stir. The news traveled to Defendant Sam Olens, who was then the president of KSU. He then contacted non-party K.C. White, vice president of student affairs. Olens was concerned about the protest, so he and White set up a meeting to discuss it.

News of the protest also travelled beyond KSU. On October 1, Ehrhart, a member of the Georgia General Assembly, called Defendant Scott Whitlock, a senior assistant athletic director, and told him "that the cheerleaders should not be allowed to kneel during the national anthem." [1] ¶ 19.

On October 2, Ehrhart called Olens with the same message; he added that any kneeling cheerleaders should be removed from the team.

2

Olens assured him that the KSU cheerleaders would no longer be kneeling.

Also on October 2, Defendant Neil Warren, the Cobb County Sheriff, called Olens. He shared Ehrhart's view that the cheerleaders should not be permitted to kneel during the anthem.

That same day, Olens met with the presidents of the University System of Georgia. At the meeting, he received an opinion from the Georgia Attorney General's office that "students could not be prohibited from kneeling during the national anthem so long as the expression was not disruptive." *Id.* ¶ 20.

On October 4, Whitlock and Defendant Matt Griffin, then the KSU interim athletic director, called a meeting with the head cheerleading coach and several others. Whitlock announced that cheerleaders would no longer be on the field during the anthem. Instead, they would remain in the stadium tunnel with the mascot until after the playing of the national anthem.

An assistant athletic director raised concerns about the timing of the change—the protest had occurred just one week before. Olens

approved the change anyway. Dean avers that Olens made the change to appease Ehrhart and Warren.

On October 6, Warren again called Olens about the protests. Olens assured him that "it would not happen again" because the cheerleaders would not be on the field during the anthem. *Id.* ¶ 25. That same day, the *Marietta Daily Journal* reported that both Olens and Attorney General Chris Carr "'have been helpful in the situation and he believes the behavor [sic] [that is, kneeling during the national anthem] will not occur at KSU again.'" *Id.* ¶ 26 (alteration in original).

The next day, October 7, KSU played a home football game. Instead of the cheerleaders' normal routine—running out on the field before the anthem starts—they were held in the tunnel until the anthem concluded. This routine also happened at the next home game two weeks later, on October 21.

The routine change pleased Ehrhart and Warren. Warren texted an undisclosed recipient, "Not letting the cheerleaders come out on the field until after the national anthem was one of the recommendations that Earl [Ehrhart] and I gave [Olens]!" *Id.* ¶ 29 (alteration in original).

Ehrhart texted Warren, "[Olens] had to be pushed there but with you and I pushing he had no choice. Thanks for you [sic] patriotism my friend." *Id.* (alteration in original).

Ehrhart is the chairman of the Georgia General Assembly's house committee that approves the budget for Georgia universities, including KSU. This is a potential source of significant leverage over the university. Dean's averments suggest that Ehrhart used this leverage to influence Olens to make the routine change.

On October 9, the *Marietta Daily Journal* ran an article addressing "you kids," referring to the KSU cheerleaders. It warned that the sheriff "is about the last person you want to mess with in any county" and that "[Warren and Ehrhart] are very upset with you." *Id.* ¶ 34 (alteration in original). The author's (Dick Yarborough) parting shot was ominous: "Don't say I didn't warn you." *Id.* Dean avers that this article was written at Warren and Ehrhart's behest.

On November 8, Olens rescinded the routine change, and the cheerleaders returned to the field before the playing of the national anthem.

5

Based on these facts, Dean has brought this suit under 42 U.S.C. § 1983, alleging that Olens and Whitlock deprived her of her First and Fourteenth Amendment rights to free speech (count one). She also alleged under the Ku Klux Klan Act, 42 U.S.C. § 1985(3), that Ehrhart and Warren conspired to violate her constitutional rights (count two). This Order addresses only Ehrhart and Warren's motions to dismiss count two.

## II.   Legal Standard

Federal Rule of Civil Procedure 8(a)(2) requires that a complaint provide "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" This pleading standard does not require "detailed factual allegations," but it does demand "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

Under Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Chandler v. Sec'y of Fla. Dep't of Transp.*, 695

6

F.3d 1194, 1199 (11th Cir. 2012) (quoting *id.*). The Supreme Court has

explained this standard as follows:

> A claim has facial plausibility when the plaintiff pleads
> factual content that allows the court to draw the reasonable
> inference that the defendant is liable for the misconduct
> alleged. The plausibility standard is not akin to a
> "probability requirement," but it asks for more than a sheer
> possibility that a defendant has acted unlawfully.

*Iqbal*, 556 U.S. at 678 (citation omitted) (quoting *Twombly*, 550 U.S. at

556); *see also Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1324–25 (11th Cir.

2012).

Thus, a claim will survive a motion to dismiss only if the factual

allegations in the complaint are "enough to raise a right to relief above

the speculative level . . . ." *Twombly*, 550 U.S. at 555–56 (citations

omitted). "[A] formulaic recitation of the elements of a cause of action

will not do." *Id.* at 555 (citation omitted). While all well-pleaded facts

must be accepted as true and construed in the light most favorable to

the plaintiff, *Powell v. Thomas*, 643 F.3d 1300, 1302 (11th Cir. 2011),

the Court need not accept as true the plaintiff's legal conclusions,

including those couched as factual allegations, *Iqbal*, 556 U.S. at 678.

Thus, evaluation of a motion to dismiss requires two steps: (1) eliminate any allegations in the pleading that are merely legal conclusions, and (2) where there are well-pleaded factual allegations, "assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.

## III. Discussion

Dean avers that Ehrhart and Warren conspired together in violation of § 1985(3) to deprive her of her First Amendment rights by orchestrating and encouraging KSU's effective prohibition of kneeling during the national anthem.

"Section 1985(3) prohibits conspiracies between 'two or more persons . . . for the purposes of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws . . . .'" *Peters v. Caldwell*, No. 4:12-cv-149-HLM, 2012 WL 13020713, at *9 (N.D. Ga. Sept. 10, 2012) (alterations in original) (quoting 42 U.S.C. § 1985(3)).

> The elements of a cause of action under § 1985(3) are: (1) a conspiracy, (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities

under the laws; and (3) an act in furtherance of the conspiracy, (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*Childree v. UAP/GA CHEM, Inc.*, 92 F.3d 1140, 1146–47 (11th Cir. 1996).

The second element of a § 1985(3) claim "requires a showing of some 'racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action.'" *Id.* at 1147 (quoting *Lucero v. Operation Rescue*, 954 F.2d 624, 628 (11th Cir. 1992)). Defendants contend that Dean has failed to demonstrate the animus required to satisfy this aspect of a § 1985(3).

Significant debate exists over the scope of classes against which a § 1985(3) animus may be alleged. The text refers to a purposeful deprivation of the rights of "any person or class of persons . . . ." 42 U.S.C. § 1985(3). A purely textual reading of this statute would indicate that the universe of § 1985(3) classes is quite broad.

However, the statute has acquired layers of judicial gloss over the years. The primary one derives from the language quoted above,

9

originally from the Supreme Court's decision in *Griffin v. Breckenridge*,

403 U.S. 88, 102 (1971). It is worth repeating in full context.

> The language requiring intent to deprive of equal protection,
> or equal privileges and immunities, means that there must
> be some racial, or perhaps otherwise class-based, invidiously
> discriminatory animus behind the conspirators' action.

*Id.*

Considering the historical context and legislative history of the Ku

Klux Klan Act (§ 1985), the *Griffin* Court determined that the classes

contemplated by the statute are limited. The legislative history of the

statute reveals that Congress's aim in passing § 1985 was to curtail the

egregious persecutions of the Ku Klux Klan, who through terrorism and

intimidation targeted a specific class of persons, namely, freed black

slaves and their sympathizers. The KKK deprived persons of their

rights to due process and other constitutional guarantees attendant to

American citizenship. Congress created § 1985 as a remedy.

Bearing this aim in mind, the Supreme Court remained concerned

about the unbridled expansion of federal liability under § 1985(3); thus,

it narrowly tailored its application to conspiracies against certain

10

classes to prevent its devolution into a "general federal tort law . . . ."

*Id.* The Court warned:

> The constitutional shoals that would lie in the path of interpreting § 1985(3) as a general federal tort law can be avoided by giving full effect to the congressional purpose—by requiring, as an element of the cause of action, the kind of invidiously discriminatory motivation stressed by the sponsors of the limiting amendment.

*Id.* Thus, the class-based animus restriction was born.

The inferior federal courts have done their best to divine the contours of these judicially imposed limitations on § 1985(3). Differing conclusions, however, are inevitable. Which classes of persons are and are not protected varies among the circuit courts of appeals, and Supreme Court guidance is relatively sparse. Thus, armed with what it gleans from its own and other circuits, the Court addresses Defendants' arguments that Dean has failed to plead a § 1985(3) class-based animus.

Dean's class-based animus allegations fall into two categories. First, she contends that Defendants conspired with a race-based animus, either directly because of her race or indirectly because the issue she protested was race-based. Second, she contends that

11

Defendants acted with a political class-based animus because her protest was political. These are taken in turn.

## A.    Race-Based Animus

It is clear that a racial animus will support a claim under § 1985(3). *See id.*; *McLellan v. Miss. Power & Light Co.*, 545 F.2d 919, 928 (5th Cir. 1977) ("[R]acial discrimination is encompassed by [§ 1985]."). However, "[t]he mere fact that plaintiff is black is insufficient to support an inference of racial motivation in a section 1985 claim." *Charles v. Saundry*, No. 3:06cv211(AHN), 2008 WL 11411166, at *15 (D. Conn. June 11, 2008). Accordingly, no § 1985(3) claim will lie absent averments that Defendants' allegedly wrongful actions were based on, rather than coincidental with, Dean's race.

Dean avers, "Ehrhart and Warren engaged in the conspiracy against [Dean] because of her race . . . ." [1] ¶ 50. This averment is conclusory as to Defendants' motives. This is enhanced by other portions of the complaint suggesting that Defendants acted because Dean and the other cheerleaders knelt during the national anthem, which they perceived to be disrespectful. This motive is non-racial and

cuts against Dean's contention that Defendants were motivated based on her race. Thus, the Court concludes Dean's § 1985(3) claim cannot proceed on a theory that Defendants acted with a direct race-based animus.

Dean also asks the Court to infer from the facts pled that Defendants acted with an *indirect* race-based animus because she was protesting police brutality against black Americans by kneeling during the anthem. This correlation is, however, insufficient to allow the Court to conclude that § 1985(3) animus has been shown, even indirectly.[1]

Like her direct race-based allegation, the complaint shows only that Defendants acted adversely to Dean and that, coincidentally, Dean was protesting the issue of police brutality that primarily impacts black Americans. But this still leaves too much speculation that Defendants acted *because* Dean's protests were related to racial issues. Cutting against this once again, the averments suggest that Defendants' motive

---

[1] The Court notes that it is unlikely that a § 1985(3) claim may be predicated on a "disparate impact" theory of discrimination. *See Majeske v. Fraternal Order of Police, Local Lodge No. 7*, 94 F.3d 307, 311 (7th Cir. 1996) ("Disparate impact alone does not satisfy the pleading requirements for either § 1983 or § 1985(3)."). This further supports its conclusion that dismissal is appropriate.

was, at least in their view, patriotic. The averments do not provide the Court with enough to conclude that they acted against Dean and the other cheerleaders for any reason other than perceived disrespect to the flag.

The Supreme Court's decision in *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993), supports the Court's conclusion that an inference of racial motive is inappropriate on these facts. The *Bray* plaintiffs sued private protesters who physically blocked their entry into an abortion clinic. They argued that the protester-defendants conspired together to violate their constitutional right to obtain an abortion based on their membership in the class of "women." Similarly to Dean, the *Bray* plaintiffs argued that Defendants actions were targeted at plaintiffs seeking abortion, and that because abortion is a procedure undertaken only by women, the Defendants acted with an animus against women.

The Supreme Court rejected this theory. Citing numerous sex-discrimination cases, the Court analogized from its previous decisions declining to hold that discrimination related to an "activity engaged in

14

only by women . . . is *ipso facto* to discriminate invidiously against

women as a class." *Id.* at 271 (footnote omitted). The Court further

explained,

> "'Discriminatory purpose'" . . . "implies more than intent as
> volition or intent as awareness of consequences. It implies
> that the decisionmaker . . . selected or reaffirmed a
> particular course of action at least in part 'because of,' not
> merely 'in spite of,' its adverse effects upon an identifiable
> group."

*Id.* at 271–72 (second alteration in original) (quoting *Pers. Adm'r of*

*Mass. v. Feeney*, 442 U.S. 256, 279 (1979)).

 *Bray*'s conclusion applies here as well. Dean contends that

Defendants conspired based on race because her protest related to an

issue primarily affecting black Americans. But *Bray* counsels against

such an inference. Dean's complaint demonstrates that Defendants

acted in spite of, rather than because of, Dean's race—or the race-based

issues she was protesting. Without a greater causal connection between

race and Defendants' actions, Dean's contention must be rejected.

 Applying *Bray*'s conclusion is even more compelling here than in

*Bray* itself. That case involved issues related to pregnancy and

abortion—issues exclusively affecting women. Contrastingly, Dean's

protests do not share the same exclusivity with respect to her race. That is, the correlation between the activity (abortion) and the class (women) in *Bray* was much closer. A non-black person may participate, protest, and sympathize with Dean's cause—indeed, police brutality affecting a class of Americans troubles Americans across the ethnic spectrum.

If *Bray* found the correlation between abortion and the proposed class (women) insufficient, then the correlation Dean suggests must also be insufficient for the Court to hold that Defendants' attempted prohibition of Dean's protests was racially motivated. This is true even if, contrary to the complaint's suggestion, the prohibition was aimed at the protest-cause (police brutality) rather than the protest-expression (kneeling during the anthem).

Thus, the Court must also reject Dean's indirect race-based animus theory in light of *Bray*.

### B.    Political Class-Based Animus

Dean also argues that Defendants were invidiously animated to conspire against her due to her membership in a political class, i.e., that

class of people "protesting police brutality against African Americans." [1] ¶ 50.

Whether a § 1985(3) conspiracy can be predicated on animus against a political class appears to be an unsettled question in the Eleventh Circuit. The Court therefore turns to persuasive authority and applies it in light of existing precedent. Upon reviewing the courts that have encountered this question, this Court is persuaded to follow the Third Circuit's decision in *Farber v. City of Paterson*, 440 F.3d 131 (3d Cir. 2006). *Farber* rejected a political class-based theory of § 1985(3) liability.

*Farber* ruled after confronting a tension inherent in § 1985(3) cases. This tension is created, on the one hand, because the Supreme Court has strongly suggested that a § 1985(3) conspiracy may be animated against non-racial classes. Quoting familiar language from *Griffin*, the Third Circuit recognized that a § 1985(3) "claimant must allege 'some racial, *or perhaps otherwise class-based*, invidiously discriminatory animus behind the conspirators' action' in order to state a claim." *Farber*, 440 F.3d at 135 (quoting *Griffin*, 403 U.S. at 102).

17

Thus, § 1985(3) animus may be based on (1) race or (2) an otherwise

class-based characteristic. This fact tends toward broadening § 1985(3).

Tugging in the opposite direction is a universal hesitancy to allow

such broadening, lest § 1985(3) become an expansive regime of federal

tort law. *See id.* ("Despite its application to private conspiracies,

§ 1985(3) was not intended to provide a federal remedy for 'all tortious,

conspiratorial interferences with the rights of others,' or to be a 'general

federal tort law.'" (quoting *Griffin*, 406 U.S. at 101–02)). These

principles evoke a tension between the expansive and restrictive

policies underlying § 1985(3) cases.

To reconcile this tension, the Third Circuit developed from *Griffin*

a two-part test.

> There are two distinct aspects to the "class-based
> invidiously discriminatory animus" which, we now know,
> will support a § 1985(3) claim—the first is defined by form,
> and the second by function. Thus, a plaintiff must allege
> both that the conspiracy was motivated by discriminatory
> animus against an identifiable class and that the
> discrimination against the identifiable class was invidious.

*Id.*

18

So, the Court must ask these questions: Is Dean's proposed class an "identifiable class," and if so, did Defendants act with invidious animus against that class?

### 1.    Dean's Proposed Class Is Not Identifiable

First, the Court asks whether the proposed § 1985(3) class has an independent, identifiable existence such that "a reasonable person must be able to 'readily determine by means of an objective criterion or set of criteria who is a member of the group and who is not.'" *Id.* at 136 (quoting *Aulson v. Blanchard*, 83 F.3d 1, 5–6 (1st Cir. 1996)). The Third Circuit includes as examples of identifiable classes women and registered Republicans. Contrastingly, it lists as "amorphous group[s] defined by 'conduct the § 1985(3) defendant disfavors,'" *id.* (quoting *Bray*, 506 U.S. at 269), "women seeking abortion," *id.*, and "persons who support [political] candidates," *id.* (alteration in original) (quoting *Aulson*, 83 F.3d at 4).

Dean's proposed persons-protesting-police-brutality class is analogous to the latter—the amorphous, non-identifiable classes. It is

19

expansive and indeterminate, and lacks cohesive characteristics among the putative class members.

Writing for the Court, Justice Scalia expounded the concept of a "class," concluding that it

> unquestionably connotes something more than a group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors. Otherwise, innumerable tort plaintiffs would be able to assert causes of action under § 1985(3) by simply defining the aggrieved class as those seeking to engage in the activity the defendant has interfered with.

*Bray*, 506 U.S. at 269. In this case, the proposed class is united primarily by the fact that they are all victims of Defendants' disdain for kneeling during the anthem. This characteristic is insufficient to create a class cognizable under § 1985(3).

In rejecting Dean's class, the Court finds further support in the First Circuit's decision in *Aulson*, which *Farber* also relied upon. *Aulson* rejected a § 1985(3) class of persons opposed to the political "old guard" in Georgetown, Massachusetts. The First Circuit found this proposed class to be "wholly indeterminate." *Aulson*, 83 F.3d at 6.

20

Dean's class is similarly indeterminate; it could include any number of persons sympathize with victims of police brutality, or affiliate with the Black Lives Matter movement. The proposed class possesses no membership characteristics constituting it as an "identifiable segment of the community by reference to any objective criteria" other than shared propensity for kneeling during the national anthem. *Id.* That is, other than doing the same things, the proposed class has little objective cohesion, and the association becomes too amorphous to constitute a judicially cognizable class under § 1985(3).

This amorphous association implicates an important distinction found in § 1985(3) cases that relates to the mutability of a uniting class characteristic. The Third Circuit recognized this distinction when it concluded that the easy § 1985(3) cases are when "some groups, particularly those deemed to be distinguishable from others by immutable characteristics, such as African-Americans, women, and the mentally retarded, are so clearly accepted as objectively identifiable that no extended analysis is needed." *Farber*, 440 F.3d at 137.

21

The question is more difficult, however, "when what is at issue is a putative class defined, as here, by mutable characteristics such as opinion or conduct." *Id.* Like *Farber*, Dean's is one of those cases. And like *Farber*, the class must be rejected.

Dean's affiliation with police-brutality protests is not based on an immutable characteristic; her association is one of choice and conviction. And however admirable or just or noble it may be, even if Defendants' actions were based on her political association, any discrimination would be of a different kind than if Defendants had targeted her because she was black. Thus, considering the distinction between her proposed political class and the classes intended to fall within § 1985(3)'s proscriptions traditionally united by immutable characteristics, the concept of a political class must be rejected.

The Court is aware that binding Fifth Circuit precedent indicates that classes based on "political beliefs or associations" are cognizable under § 1985(3). *Kimble v. D. J. McDuffy, Inc.*, 648 F.2d 340, 347 (5th Cir. June 1981). However, this indication derives from dicta and was decided prior to the Supreme Court's decision in *Bray*. The present legal

landscape, considering the admonitions of the Supreme Court and courts of appeals, compel the Court to decline to extend § 1985(3) liability in this case for a class based on the mutable characteristics of Dean's proposed political class. *Accord Farber*, 440 F.3d at 142 ("[W]e have also held that discrimination 'based on . . . mental handicap, like that based on gender, often rests on immutable characteristics which have no relationship to ability. Where this is the case, we are convinced that the discrimination is invidious . . . .' While we do not hold that discrimination motivated by a mutable characteristic can never be invidious, political affiliation surely does not qualify." (alteration in original) (citation omitted) (quoting *Lake v. Arnold*, 112 F.3d 682, 687 (3d Cir. 1997))).

### 2.   Defendants' Alleged Animus Was Not Invidious

The Court also concludes that even if Dean's proposed political class was actionable, Defendants' alleged animus against it was not "so 'invidious' as to qualify for § 1985(3) protection." *Id.* at 138.

> The nature of the "invidiously discriminatory animus" *Griffin* had in mind is suggested both by the language used in that phrase ("invidious . . . [t]ending to excite odium, ill will, or envy; likely to given offense; esp., unjustly and

23

irritatingly discriminating," Webster's Second International
Dictionary 1306 (1954)) and by the company in which the
phrase is found ("there must be *some racial, or perhaps
otherwise class-based*, invidiously discriminatory animus.").

*Bray*, 506 U.S. at 274 (alterations in original) (quoting *Griffin*, 403 U.S.
at 102). Even if Dean had alleged a cognizable class-based animus, it
would not meet *Bray*'s threshold.

The Third Circuit concluded in *Farber* that if the *Bray* defendants'
"goal of preventing abortion does not qualify [as an invidious animus],
then surely neither does the goal of replacing, with one's own, members
of an opposing political party in an exercise of classic political
patronage." *Farber*, 440 F.3d at 142. That is, if the *Bray* defendants'
animus was not sufficiently invidious, neither was the *Farber*
defendants' animus because it was lesser in degree than that in *Bray*.

Similarly, this Court concludes that if opposition to abortion is not
invidiously discriminatory, neither then is opposition to kneeling during
the national anthem, even if it disproportionately affects those
protesting racial justice issues. Defendants were exercising their own
First Amendment rights when they spoke their minds to the KSU
administration about their opposition to Dean's protest. And their only

discernable motive was their view that the flag and the anthem should be respected, and that what Dean and the other cheerleaders were doing was, in their mind, disrespectful.

When these allegations are viewed as a whole, Defendants' conduct was not so invidious as to lump it together with the odium of racism prevalent during the post-Civil-war era and thus subject them to liability under § 1985(3). Defendants' conduct bears little resemblance to conspiratorial persecution on the basis of immutable characteristics by the KKK—the original aim of § 1985(3)'s proscriptions. The proposed political class must therefore be rejected.

### 3.    Other Considerations

The Court, while largely applying non-binding case law, finds some solace that its ruling is consistent with the spirit of precedent from the pre-1981 Fifth Circuit. Some of these cases dealing with § 1985(3) suggest that the Court's conclusion is on track.

In *McLellan*, the Fifth Circuit declined to allow bankrupts as a class to state a § 1985(3) claim. While recognizing that the Supreme Court had not foreclosed the application of § 1985(3) to non-racial

classes, *McLellan* noted that "[§] 1985(3) will not be extended to every class which the artful pleader can contrive." 545 F.2d at 928. The Court's caution here in expanding § 1985(3) to cover Dean's proposed political class is responsive to this admonition by rejecting amorphous class definitions. The Fifth Circuit also commended "the exercise of restraint when a court is confronted with class-based discrimination grounded in a non-racial animus." *Id.* at 929. The Court also honors this commendation by disallowing the proposed political class.[2]

*McLellan* was decided in 1977, before *Bray*, which reiterated the need for restraint in the expansion of classes cognizable under

---

[2] An independent ground for granting Defendants' motion to dismiss arises from *McLellan*'s holding, though it was not directly raised by the parties. *McLellan* held,

> If the object of the defendants' conspiracy did not include a violation of some law (independent of section 1985(3) itself) which protects the plaintiff, the conspiracy could not have deprived the plaintiff of the 'protection of the laws.' Put more simply, there can only be a deprivation of the rights of a plaintiff when the action of the defendants is otherwise illegal.

*McLellan*, 545 F.2d at 925. This is binding precedent on this Court. Because Dean has not averred that, other than violating § 1985(3), Defendants' conspiracy was illegal, a § 1985(3) claim will not lie.

§ 1985(3). If the classes are to be expanded, it is better done by the intermediate federal courts than this Court in the first instance.

The Court also grounds its decision in a final concern. As the Fourth Circuit noted, a pre-*Bray* Supreme Court decision "found disconcerting the argument that § 1985(3) provides 'a remedy for every concerted effort by one political group to nullify the influence or do injury to a competing group by use of otherwise unlawful means.'" *Harrison v. KVAT Food Mgmt., Inc.*, 766 F.2d 155, 161 (4th Cir. 1985) (quoting *United Bhd. of Carpenters & Joiners of Am. v. Scott*, 463 U.S. 825, 836 (1983)). *Scott* warned that recognizing a § 1985 class of union members means "the proscription of § 1985(3) would arguably reach the claim that a political party has interfered with the freedom of speech of another political party by encouraging the heckling of its rival's speakers and the disruption of the rival's meetings." 463 U.S. at 836.

This case appears to be precisely that which the Supreme Court warned against in *Scott*. Accepting Dean's claim that Defendants acted with a political class-based animus would insert federal judicial referees into the court of public opinion, which it is hesitant to do without more

clear guidance from the Eleventh Circuit or Supreme Court that this would be its proper role. Thus the Court feels compelled to conclude that Dean has failed to state a claim under § 1985(3).[3]

## IV.   Conclusion

Defendants' motions [14, 23] are granted. Because the Court rules for Defendants on the issue of § 1985(3) animus, it declines to address the First Amendment issue. The Clerk is directed to drop Ehrhart and Warren as parties to this case.

IT IS SO ORDERED this 7th day of February, 2019.

Timothy C. Batten, Sr.
United States District Judge

---

[3] The Court has reviewed the cases submitted by Dean in opposition to Defendants' motions but finds them unpersuasive, primarily in light of *Bray*'s holding, which was handed down after most of the cases Dean relied upon.

28