UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

TOMMIA DEAN,                          )
                                      )
        Plaintiff,                    )
                                      )        CIVIL ACTION FILE NO.:
v.                                    )        1:18-cv-04224-TCB
                                      )
SAMUEL S. OLENS, et al.,              )
                                      )
        Defendants.                   )

## MEMORANDUM IN SUPPORT OF
## DEFENDANTS OLENS, WHITLOCK, AND GRIFFIN'S
## MOTION FOR JUDGMENT ON THE PLEADINGS

**COME NOW**, Defendants Samuel S. Olens, Scott Whitlock, and Matt Griffin

(the "KSU Defendants") and, pursuant to Local Rule 7.1A, N.D.Ga., submits this

Memorandum in Support of their Motion for Judgment on the Pleadings.

## FACTUAL ALLEGATIONS

Plaintiff is a student at Kennesaw State University (KSU) and was a member of

the 2017-18 KSU Cheerleading Squad. (Doc. 1 ["Compl."], ¶¶ 2, 12; Doc. 33

["Answer"], ¶¶ 2, 12.)  She alleges that in September 2017, she and other members of

the KSU Cheerleading Squad (who are not parties to this action) decided to kneel during

the National Anthem at the next KSU home football game. (Compl., ¶¶ 9-12.)  In

reaching this decision, they were apparently inspired by the similar actions of Colin

Kaepernick and other NFL players.[1] Accordingly, on September 30, 2017, during KSU's second home football game of the season, Plaintiff and four other cheerleaders knelt on the football field during the National Anthem. (Compl., ℗ 13.)

According to Plaintiff, Defendant Olens, then-President of KSU, did not attend the September 30, 2017 game but learned from other KSU officials later that day that some members of the Cheerleading Squad had knelt during the National Anthem. (Compl., ℗ 14; Answer, ℗ 14.)  The following day, October 1, 2017, (former) State Representative Earl Ehrhart called Defendant Scott Whitlock, KSU's Senior Assistant Athletic Director, to express his opinion that cheerleaders should not be allowed to kneel during the National Anthem. (Compl., ℗℗ 4, 19; Answer, ℗℗ 4, 19.) Ehrhart made a similar call to Defendant Olens on October 2, 2018, once again expressing his opinion that cheerleaders should not be permitted to kneel during the National Anthem and also opining that any cheerleader who continued to do so should be removed from the KSU Cheerleading Squad. (Compl., ℗ 21; Answer, ℗ 21.)[2] That same day, Olens received a

---

[1] Kaepernick's act of kneeling during the National Anthem was "to protest police brutality against black Americans."  (Compl., ℗ 9.)

[2] Plaintiff further alleges that Defendant Olens "assured Ehrhart that the cheerleaders at KSU would not again be kneeling during the National Anthem," although she is unclear whether this alleged assurance was provided by Olens during this October 2, 2017 conversation or during "another communication," presumably occurring on October 6, 2017. (Compl., ℗℗ 21, 25; Answer, ℗ 25.)

similar telephone call from Neil Warren, the Cobb County Sheriff, in which he likewise expressed his opinion to Olens that cheerleaders should not be permitted to kneel during the National Anthem. (Compl., ⁋ 22; Answer, ⁋ 22.)[3]

On October 4, 2017, Defendant Matt Griffin, KSU's (then) Interim Athletic Director, and Defendant Whitlock called a meeting with various other KSU officials,[4] during which Whitlock allegedly "announced that, at the next home game, [the] cheerleaders would not be allowed on the field during the National Anthem, but would remain in the stadium tunnel with the mascot." (Compl., ⁋ 23; see also Answer, ⁋ 23.) Plaintiff further alleges that, later that same day, "Griffin met with Olens to obtain permission to make the change to the pregame routine, explaining that the cheerleaders would no longer be on the field during the National Anthem," and that at this meeting, "Olens gave Griffin permission to make the change." (Compl., ⁋ 24.)[5]

---

[3] Plaintiff does not allege that either Ehrhart or Warren purported to direct Defendants Whitlock or Olens to take any actions affecting any of the cheerleaders, including Plaintiff. (Compl., ⁋⁋ 21-22; Answer, ⁋⁋ 21-22.)

[4] Those in attendance at this meeting were Spirit Squad Coordinator Brandon Asciutto, (then) Director of Marketing and Fan Experience Josh Baker, (then) Assistant Athletic Director Michael DeGeorge, and (then) Spirit Squad Program Administrator Natasha Koutnik. (Compl., ⁋ 23; Answer, ⁋ 23.)

[5] Plaintiff contends that "[t]he only purpose of making the change [to the pre-game show] was to appease [former Representative] Ehrhart and [Sheriff] Warren. (Compl., ⁋ 24; Answer, ⁋ 24.) While Plaintiff does not explicitly identify a factual basis for this

On October 6, 2017, Sheriff Warren again placed a telephone call to Olens about the cheerleaders kneeling, at which time Olens told Warren that the cheerleaders would not be on the field during the National Anthem.  (Compl., P 25; see also Answer, P 25.) Plaintiff further alleges that during KSU's next two home football games, on October 7 and 21, 2017, the KSU Cheerleading Squad was "held … in the tunnel until the National Anthem was over, at which time they were allowed [on] the field …." (Compl., PP 27, 37; see also Answer, PP 27, 37.)  Plaintiff does not allege, however, that she or any other cheerleader was prevented from kneeling during the National Anthem and, in fact, acknowledges that she and several other cheerleaders did so at the October 21, 2017 game, if not the October 7, 2017 game as well. (Compl., P 37; Answer, P 37.)

## ARGUMENT AND CITATION OF AUTHORITY

Based on the above-described allegations, Plaintiff asserts First Amendment claims against the KSU Defendants pursuant to 28 [sic] U.S.C. § 1983,[6] contending that

---

conclusory assertion, she does allege that "Warren and Ehrhart took credit for … pressuring [Defendant] Olens into not allowing the cheerleaders onto the field [prior to the National Anthem]." (Compl., P 29; Answer, P 29.)

[6] In her Complaint, Plaintiff also makes reference to – but does not purport to assert a substantive claim under – the Fourteenth Amendment.  (Compl., PP 42-43.) As such, it appears that the Fourteenth Amendment is referenced only as the vehicle by which the First Amendment is made applicable to state government actors such as the KSU Defendants. See Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale, 901 F.

they violated her constitutional right to freedom of speech by preventing her from kneeling on the football field during the National Anthem at the October 7 and 21, 2017 games. (Compl., ¶¶ 41-47.)[7] For the reasons that follow, the KSU Defendants are entitled to judgment on the pleadings on the grounds of qualified immunity.

## A.      Controlling Legal Standards

### 1.      The Rule 12(c) Standard

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c); see also Fed. R. Civ. P. 12(h)(2) ("Failure to state a claim upon which relief can be granted ... may be raised ... by a motion under Rule 12(c)."). In evaluating a motion for judgment on the pleadings, the court considers the factual allegations of the complaint, the answer, and any other pleadings of record as defined by Rule 7(a), as well as any exhibits that may be attached thereto, Horsley v. Feldt, 304 F.3d 1125, 1133-35 (11th Cir. 2002), but all material conflicts must be resolved in favor of the plaintiff.  See Mikko v. City of Atlanta, 857

---

3d 1235, 1239 (11th Cir. 2018) (First Amendment is made applicable to state governments through Fourteenth Amendment).

[7] Plaintiff also asserted claims against Ehrhart and Warrant pursuant to 28 [sic] U.S.C. § 1985(3), alleging that they engaged in a conspiracy to deprive her of her federally protected constitutional rights. (Compl., ¶¶ 48-54.) The Court dismissed those claims by Order entered February 7, 2019.  (Doc. 36.)

F.3d 1136, 1139 (11th Cir. 2017) (court required to take facts in complaint as true and view them in light most favorable to plaintiff).

At the same time, however, under Rule 12(c), the complaint's allegations are evaluated under the same standards applicable to a Rule 12(b)(6) motion to dismiss. Boyd v. Peet, 249 F. App'x 155, 157 (11th Cir. 2007) (applying Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007) standard in affirming judgment on the pleadings for defendant); Losey v. Warden, 521 F. App'x 717, 719 (11th Cir. 2013) (applying Ashcroft v. Iqbal, 556 U.S. 662 (2009) standard to analysis of motion for judgment on the pleadings). As such, "[t]he complaint's allegations must plausibly suggest that the plaintiff has a right to relief, raising that possibility above a 'speculative level.'" Boyd, 249 F. App'x at 157. Indeed, the factual allegations must establish "more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678.[8] "[I]f they do not, the plaintiff's complaint should be dismissed." Boyd, 249 F. App'x at 157. See also Iqbal, 556 U.S. at 679 (Where its well-pleaded allegations do not permit the court to infer more than the mere possibility of the violation of a right, "the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'").

---

[8] "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557).

## 2.    <u>The Qualified Immunity Standard</u>

The <u>Iqbal</u> and <u>Twombly</u> standard for reviewing the sufficiency of the factual allegations of a complaint is of particular relevance to the defense of qualified immunity, which compels an inquiry into whether the constitutional right allegedly violated by the defendant was "clearly established." Indeed, the <u>Iqbal</u> Court held that where, as here, the motion to dismiss (or for judgment on the pleadings) is based on qualified immunity, "the sufficiency of [the complaint] is both 'inextricably intertwined with [and] directly implicated by' the qualified immunity defense." <u>Iqbal</u>, 556 U.S. at 673.  Therefore, to survive the motion, the plaintiff's complaint must "plead factual matter that, if taken as true, states a claim that [the defendants] deprived [her] of [her] clearly established constitutional rights." <u>Id.</u> at 666.[9]

"Qualified immunity shields public officials from liability … when their conduct does not violate a constitutional right that was clearly established at the time of the

---

[9] While the complaint's well-pleaded factual allegations are accepted as true, the same benefit is not afforded to bare "legal conclusions," <u>id.</u> at 678, such as an assertion that a given act by the plaintiff is protected expression under the First Amendment or that a particular decision violated the plaintiff's First Amendment rights. (<u>See, e.g.</u>, Compl., ⁋⁋ 16, 42, 44.) To the contrary, neither such "[l]abels and conclusions" nor the "formulaic recitation of the elements of a cause of action" are sufficient to raise a right to relief – let alone a clearly established right – above the speculative level necessary to avoid dismissal. <u>Twombly</u>, 550 U.S. at 555.

challenged action." <u>Echols v. Lawton</u>, 913 F.3d 1313, 1319 (11th Cir. 2019). When asserting his entitlement to qualified immunity, a government official must initially establish that his actions, as alleged in the complaint, were within the scope of his discretionary authority. <u>Mathews v. Crosby</u>, 480 F.3d 1265, 1269 (11th Cir. 2007). Once this showing is made, a "presumption of qualified immunity" arises. <u>Glenn v. City of Columbus</u>, 375 Fed. App'x 928, 931 (11th Cir. 2010).[10]  The burden then shifts to the plaintiff "[t]o defeat the presumption of qualified immunity [by] demonstrate[ing] both [1] that the facts, when viewed in a light most favorable to the plaintiff, establish a constitutional violation and [2] that the illegality of the officer's actions was 'clearly established' at the time of the incident." <u>Id.</u> (citing <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009)); <u>see also</u> <u>Grider v. City of Auburn</u>, 618 F.3d 1240, 1254 (11th Cir. 2010).

**B.   <u>The KSU Defendants Are Entitled to Judgment on the Pleadings on the Grounds of Qualified Immunity</u>**

**1.   <u>The KSU Defendants Acted within Their Discretionary Authority</u>**

The KSU Defendants show that they were acting within the scope of their discretionary authority by identifying "objective circumstances which would compel

---

[10] Thus, a public official's entitlement to qualified immunity is the rule rather than the exception, as it protects "all but the plainly incompetent or those who knowingly violate the law." <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986); <u>see also</u> <u>Ashcroft v. al-Kidd</u>, 563 U.S. 731, 743 (2011) (same); <u>Johnson v. Conway</u>, 688 F.3d 700, 705-06 (11th Cir. 2017) (same).

the conclusion that [their] actions were undertaken pursuant to the performance of [their] duties and within the scope of [their] authority." (Internal quotations omitted.) Hutton v. Strickland, 919 F.2d 1531, 1537 (11th Cir. 1990).  Simply put, the inquiry focuses on whether the acts "are of a type that fell within the [defendant]'s job responsibilities." Holloman v. Harland, 370 F.3d 1252, 1265 (11th Cir. 2004). The KSU Defendants easily satisfy this standard.

Plaintiff alleges that on October 4, 2017, Defendants Whitlock and Griffin called a meeting with various KSU officials during which Whitlock announced a change to the pre-game run-of-show for the next home football game. According to Plaintiff, Whitlock explained that the KSU Cheerleading Squad would not be allowed on the field during the National Anthem, but would remain in the stadium tunnel with the mascot. (Compl., ¶ 23.) Plaintiff further alleges that later that afternoon – subsequent to Whitlock's announcement – Defendant Olens was advised by Griffin of the change to the pre-game run-of-show and gave him permission to make the change. (Compl., ¶ 24.)

There can be no dispute that Griffin and Whitlock were acting within their discretionary authority as KSU's Interim Athletic Director and Associate Athletic Director, respectively, when they allegedly decided to change the pre-game run-of-

show, called a meeting to notify other KSU officials,[11] and implemented the decision. Nor can there be any dispute that Defendant Olens was acting within his discretionary authority as KSU President when he met with Griffin later that day and either purportedly approved or did not overrule the decision. Indeed, Plaintiff has not challenged the authority or discretion of any of the KSU Defendants to take any of these actions.[12] Accordingly, the objective circumstances establish that each action attributed to each KSU Defendant was of a type that fell within his job responsibilities and, as such, within his discretionary authority for purposes of his qualified immunity defense. Hutton, 919 F.2d at 1537; Holloman, 370 F.3d at 1265.

---

[11] Specifically, the Spirit Squad Coordinator, the Director of Marketing and Fan Experience, another Assistant Athletic Director, and the Spirit Squad Program Administrator. (Compl., ℙ 23; Answer, ℙ 23.)

[12] Plaintiff's challenge to the constitutionality of these actions is not relevant to the discretionary authority analysis. See Holloman, 370 F.3d at 1266 (inquiry is not whether it was within defendant's authority to commit illegal act).

**2.      Plaintiff Cannot Show That Any Action She Attributes to Any KSU Defendant Violated a Clearly Established Constitutional Right**[13]

Because the actions attributed to the KSU Defendants fell within the scope of their discretionary authority, to overcome their entitlement to qualified immunity, Plaintiff must demonstrate that in October 2017: (a) she had a clearly established First Amendment right to kneel during the National Anthem on the KSU football field – to which she only had access due to her status as a member of the KSU Cheerleading Squad – while in formation with her fellow cheerleaders and wearing her KSU uniform identifying her as an official member of the KSU Cheerleading Squad, and (b) it was clearly established that implementing a change to the pre-game run-of-show resulting in all members of the KSU Cheerleading Squad – both those who stood at attention and those who (like Plaintiff) knelt during the National Anthem at the September 30, 2017 game – would violate that First Amendment right. Given the current legal landscape applicable to her First Amendment claim, Plaintiff cannot make this showing.

The "salient question" with regard to whether a given constitutional right is clearly established is "whether the state of law at the time of [the official's conduct]

---

[13] As noted above, the plaintiff must satisfy "[b]oth elements of [the two-pronged analysis] for the [defendant] to lose qualified immunity, and [the] analysis may be done in whatever order is deemed most appropriate …." Grider, 618 F.3d at 1254. In this Memorandum, the KSU Defendants address the two elements of the qualified immunity analysis in reverse order.

provided 'fair warning,'" to every reasonable official that the conduct clearly violates the Constitution." Echols, 913 F.3d at 1324. Thus, to overcome a defendant's entitlement to qualified immunity, the right alleged to be clearly established "must be defined with specificity" and not "at a high level of generality." City of Escondido v. Emmons, 2019 WL 113027 *2 (U.S. Jan. 7, 2019). As such, an official's alleged conduct violates clearly established law only when it can be said that "the contours of [the] right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." (Emphasis added.)  Echols, 913 F.3d at 1323. See also Moran v. Cameron, 362 Fed. App'x 88, 97 (11th Cir. 2010) (no violation of clearly established First Amendment right where reasonable officer could have believed that forcing plaintiff to leave public property was not unlawful); Paez v. Mulvey, 2019 WL 489048 *7 (11th Cir. Feb. 8, 2019) (no violation of clearly established constitutional right where a reasonable official could have believed the action taken was lawful or if officials of reasonable competence could disagree on the issue).

A plaintiff may show that the constitutional right allegedly violated was clearly established in three ways: "(1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes [the] constitutional right; or (3) conduct so egregious that [the] constitutional right was clearly violated, even in the total absence

of case law." (Internal quotations & citations omitted.) <u>Perez v. Suszczynski</u>, 809 F.3d 1213, 1222 (11th Cir. 2016). The Eleventh Circuit has stated that the requisite "[f]air warning is commonly provided by materially similar precedent from the Supreme Court, [the Eleventh Circuit], or the highest state court in which the case arose." <u>Santana v. Miami-Dade County</u>, 688 F. App'x 763, 773 (11th Cir. 2017) (citing <u>Terrell v. Smith</u>, 668 F.3d 1244, 1256 (11th Cir. 2012)). <u>See also</u> <u>Yates v. Cobb Cty. Sch. Dist.</u>, 687 F. App'x 866, 869 (11th Cir. 2017).  Of course, a case "directly on point is not required," but "existing precedent [must have] placed the constitutional question <u>beyond debate</u>." <u>Beckman v. Hamilton</u>, 732 Fed. App'x 737, 740 (11th Cir. 2018) (quoting <u>Mullenix v. Luna</u>, 136 S. Ct. 305, 308, 193 L. Ed. 2d 255 (2015)); <u>see also</u> <u>Santana</u>, 688 F. App'x at 773 (citing <u>Taylor v. Barkes</u>, 135 S. Ct. 2042, 192 L. Ed. 2d 78 (2015)).

First, there exists no precedent of the Supreme Court, Eleventh Circuit, or Georgia Supreme Court addressing the constitutionality of the conduct challenged here. In other words, none of the holdings of these courts would have provided fair notice to a reasonable official in the positions of the KSU Defendants that it <u>is</u> a violation of the First Amendment – <u>not</u> merely that it <u>may</u> be a violation of the First Amendment – to prevent an entire cheerleading squad of a public university – as opposed to just those who allegedly engaged in protected speech or expression at a previous game – from being on the university's football field in their university uniforms until after the

National Anthem.  There is simply no "materially similar" precedent from any of these courts which so clearly resolves this constitutional question that it is "beyond debate" that <u>every</u> reasonable president or athletic department official of a public university faced with the same or similar circumstances would know that the actions attributed to them in Plaintiff's Complaint constitute a violation of the First Amendment.

Second, there exists no broad statement of principle within the Constitution or interpretive case law that clearly establishes Plaintiff's claimed First Amendment entitlement to kneel during the National Anthem while wearing a KSU cheerleading uniform, while on the KSU football field (to which she only had access by virtue of her status as an official member of the KSU Cheerleading Squad), and while in formation with the KSU Cheerleading Squad.  Moreover, even if such a right could be regarded as clearly established, there exists no broad statement of principle within the Constitution or interpretive case law clearly establishing that by changing the pre-game run-of-show so as to have <u>all</u> cheerleaders – both those who previously stood at attention during the National Anthem <u>and</u> those who knelt – enter the football field after the National Anthem, the KSU Defendants violated that right. While "some broad statements of principle in case law [that] are not tied to particularized facts ... can clearly establish law applicable in the future to different sets of detailed facts," <u>Vinyard v. Wilson</u>, 311 F.3d 1340, 1351 (11th Cir. 2002), the principle must be sufficient to

establish with "obvious clarity" that "the unlawfulness [of the official's conduct is] apparent." <u>Id.</u> at 1353. In the present case, no such statement of principle exists.[14]

Plaintiff has previously asserted that this case should be analyzed as a school speech case and may therefore cite <u>Tinker v. Des Moines Ind. Comm. Sch. Dist.</u>, 393 U.S. 503 (1969) for the principle that "students do not shed their constitutional rights to freedom of speech or expression at the school gate." <u>Id.</u> at 505.  The <u>Tinker</u> principle, however, does <u>not</u> serve to clearly establish either the existence of the First Amendment right asserted in this case <u>or</u> the violation of that right by the actions attributed to the KSU Defendants. Indeed, in addition to being the sort of "broad legal truism" which the Eleventh Circuit has repeatedly held insufficient to clearly establish a given right, <u>see</u> <u>Beckman</u>, 732 Fed. App'x at 740, a more recent analysis of the school speech doctrine

---

[14] The absence of such a principle was apparent during the briefing and oral argument on Warren and Ehrhart's motions to dismiss. Counsel for Plaintiff, Warren and Ehrhart asserted no less than three potential standards under which Plaintiff's alleged protected expression should be analyzed: government speech, a forum analysis as applied to a non-public forum, and private student speech. While the Court ultimately did not reach the merits of the First Amendment claim in granting those motions, it acknowledged at the conclusion of oral argument that the case "presents some difficult questions." (Transcript of December 20, 2018 Motions Hearing, at 47:3.) Materials outside the pleadings generally may not be considered under Rule 12(c); however, the KSU Defendants' reference to these motions and transcript illustrates a legal point, rather than a factual one.  Even were it otherwise, a court may acknowledge without relying on such proceedings. <u>See, e.g.</u>, <u>United States v. Wells Fargo Bank, N.A.</u>, 165 F. Supp. 3d 1340, 1354 (N.D. Ga. 2015).

by the Supreme Court held that "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings." <u>Morse v. Frederick</u>, 551 U.S. 393, 396 (2007). <u>See also</u> <u>Mullenix</u>, 136 S. Ct. at 308 ("[The court must determine] whether the violative nature of particular conduct is clearly established ... in the light of the specific context of the case, not as a broad general proposition.").

Finally, for the reasons previously noted, Plaintiff certainly cannot demonstrate that the KSU Defendants' conduct "so obviously violate[d] the [First Amendment] that prior case law is unnecessary." <u>Echols</u>, 913 F.3d at 1324. "This narrow category encompasses those situations where the official's conduct lies so obviously at the very core of what the relevant constitutional provision prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law." <u>Id.</u>; <u>see also</u> <u>Gilmore v. Hodges</u>, 738 F. 3d 266, 279 (11th Cir. 2013) ("Obvious clarity cases are rare … and present a narrow exception to the general rule of qualified immunity."). This standard, for obvious reasons, "is a difficult one to meet." <u>Bussey-Morice v. Gomez</u>, 587 Fed. App'x 621, 627-28 (11th Cir. 2014).

In the present case, Plaintiff unquestionably cannot show that the conduct of the KSU Defendants as alleged in the Complaint falls within this "narrow category." To the contrary, as previously noted, a great deal of time and energy has already been expended by counsel for Plaintiff, Warren, and Ehrhart, as well as the Court, analyzing and

debating the various constitutional standards potentially applicable to Plaintiff's First Amendment claim in this case. For their part, the KSU Defendants have addressed these various standards in Sections B(3)(a), (b), and (c) of this Memorandum.  In their briefs and at oral argument, the parties have cited various court decisions in support of their respective positions (and alternative positions) regarding the potential applicability or inapplicability of a given standard.[15] Far from establishing "obvious clarity," this implicates a qualified immunity-related principle long recognized by the Eleventh Circuit; namely, that government officials cannot be held to a higher level of knowledge and understanding of the legal landscape than the courts. See Denno v. Sch. Bd. of Volusia County, 218 F.3d 1267, 1274–75 (11th Cir. 2000) (granting qualified immunity to school officials in school speech case); see also Youmans v. Gagnon, 626 F.3d 557, 565 (11th Cir. 2010). Accordingly, in contrast to "obvious clarity," Gilmore v. Hodges, 738 F. 3d at 279, this case presents difficult questions which foreclose any finding that the alleged "unlawfulness of the conduct was readily apparent to the [KSU Defendants], notwithstanding the lack of case law." Echols, 913 F.3d at 1324.[16]

---

[15] Likely contributing to the Court's observation that this case "presents some difficult questions." (Transcript of December 20, 2018 Motions Hearing, at 47:3.)

[16] In a similar vein, "[a]lthough the defendants bear no burden of showing the law was unsettled," Adams v. St. Lucie County Sheriff's Dept., 962 F.2d 1563, 1576 (11th Cir. 1992) (Edmondson, dissenting), adopted, 998 F.2d 923 (11th Cir. 1993) (en banc),

For each of the foregoing reasons, Plaintiff is unable – under any standard – to demonstrate that her alleged First Amendment right to kneel during the National Anthem while wearing a KSU cheerleading uniform, while on the KSU football field (to which she only had access by virtue of her status as an official member of the KSU Cheerleading Squad), and while in formation with the KSU Cheerleading Squad, was clearly established.  Nor is she able to demonstrate that it was clearly established that changing the pre-game run-of-show in such a way as to have <u>all</u> members of the KSU Cheerleading Squad – both those who previously stood at attention during the National Anthem <u>and</u> those who knelt – enter the football field after the National Anthem, would violate her First Amendment rights. Accordingly, the KSU Defendants are entitled to judgment as a matter of law on Plaintiff's claims on the grounds of qualified immunity.

### 3.  <u>Plaintiff Cannot Demonstrate That Any Action Allegedly Taken by the KSU Defendants Violated Her First Amendment Right</u>

As previously noted, a court need not determine whether a constitutional violation occurred under step one of the qualified immunity analysis where, as here, it is shown under step two of the analysis that the alleged constitutional right was not

---

the KSU Defendants note that a court considering somewhat analogous facts and similar legal arguments recently concluded that such speech constitutes government speech, or, in the alternative, private speech in a non-public forum that was not excluded based on viewpoint. <u>See</u> <u>Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n, Inc.</u>, No. 8:16-CV-2753-T-36AAS, 2017 WL 2458314, at *4-10 (M.D. Fla. June 7, 2017).

clearly established. See Lewis v. City of West Palm Beach, 561 F.3d 1288, 1291 (11th Cir. 2009). Nevertheless, in the pages that follow, the KSU Defendants show the Court that they are also entitled to judgment on the pleadings in this action under the first step of the two-step qualified immunity analysis, in that the facts alleged in the Complaint, even when construed in the light most favorable to Plaintiff, fail to state a claim under the First Amendment. See Grider, 618 F.3d at 1254 (under first step of qualified immunity analysis, court determines whether a constitutional violation occurred).

> **(a)** **Plaintiff's expression as a cheerleader in a KSU uniform, in formation with the KSU Cheerleading Squad, and on the KSU football field constituted government speech that is not protected by the First Amendment.**

First, under the facts as alleged in her Complaint, Plaintiff's kneeling during the National Anthem constituted KSU's expressive conduct and, as such, was not subject to First Amendment restrictions.[17] See Pleasant Grove City v. Summum, 555 U.S. 460, 467-68 (2009). On this point, the KSU Defendants adopt and incorporate herein by reference the government speech arguments more thoroughly briefed by Defendants Ehrhart (see Doc. 14-1, pp. 9-19) and Warren (see Doc. 23-1, pp. 19-21).

---

[17] Further supporting the absence of "clearly established" law as addressed in Section B(2) of this Memorandum, the Eleventh Circuit has acknowledged that it can be "difficult to tell whether a government entity is speaking on its own behalf or is providing a forum for private speech." Mech v. School Board of Palm Beach County, 806 F. 3d 1070, 1071 (2015).

     **(b)**     **<u>Even if Plaintiff did not engage in government speech, the KSU football field was a non-public forum as to which the KSU Defendants could impose reasonable restrictions, provided they did not engage in viewpoint discrimination.</u>**

Second, even if Plaintiff's kneeling during the National Anthem did not constitute government speech, the KSU football field was a non-public forum in which the KSU Defendants could restrict speech in a reasonable manner and without viewpoint discrimination without violating the First Amendment. <u>See USPS v. Council of Greenburgh Civic Assoc.</u>, 453 U.S. 114, 129-30 (1981). As to the former point, the KSU Defendants adopt and incorporate herein by reference the public forum arguments more thoroughly briefed by Defendant Warren (<u>see</u> Doc. 23-1, pp. 13-19.) As to the latter point, it is undisputed that when the pre-game run-of-show was changed, <u>all</u> members of the KSU Cheerleading Squad – both those who stood at attention during the National Anthem <u>and</u> those who knelt – entered the football field after the National Anthem. Thus, the KSU Defendants' actions were viewpoint neutral. <u>See Bloedorn v. Grube</u>, 631 F.3d 1218, 1235 (11th Cir. 2011) (ban that "applies equally to all outside, non-sponsored speakers" is viewpoint neutral); <u>Students for Life USA v. Waldrop</u>, 162 F. Supp. 3d 1216, 1240 (S.D. Ala. 2016) ("[T]he university's formal policy excludes all student expressive activity from the Perimeter. It therefore eliminates the possibility of viewpoint discrimination, since all viewpoints are banned.").

    **(c)**    **Even if Plaintiff's kneeling is analyzed as student speech, the KSU Defendants' actions were reasonable in light of the pedagogical purposes of the particular activity and did not constitute viewpoint discrimination.**

Finally, even were the Court to accept Plaintiff's argument that this case should be analyzed under the school speech framework, her speech was school-sponsored speech, as defined by <u>Hazelwood School Dist. v. Kuhlmeier</u>, 484 U.S. 260 (1988).[18] For this reason, and because of the absence of viewpoint discrimination,[19] no actions allegedly taken by the KSU Defendants violated the First Amendment. The Eleventh Circuit has described the school-sponsored speech classification as the "intermediate category" being "between the spectrum of pure student expression and government expression." <u>Bannon v. Sch. Dist. of Palm Beach Cty.</u>, 387 F.3d 1208, 1213-14 (11th Cir. 2004). In <u>Hazelwood</u>, the Supreme Court announced that a "school must also retain the authority to refuse to sponsor student speech that might reasonably be perceived to

---

[18] School-sponsored speech is defined broadly and includes "[s]chool-sponsored publications, theatrical productions, and other expressive activities that students, parents and members of the public might reasonably perceive to bear the imprimatur of the school ... whether or not they occur in a traditional classroom setting, so long as they are supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences." <u>Id.</u>

[19] As demonstrated in the preceding section of this Memorandum, the KSU Defendants' alleged conduct was viewpoint neutral, as it affected <u>all</u> members of the KSU Cheerleading Squad and <u>not</u> just those who knelt during the National Anthem. <u>See</u> <u>Bloedorn</u>, 631 F.3d at 1235; <u>Students for Life USA</u>, 162 F. Supp. 3d at 1240.

… associate the school with any position other than neutrality on matters of political controversy." Hazelwood, 484 U.S. at 272.[20]  Under this standard, school authorities may restrict "the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." Id. at 273. "Hazelwood controls all expression that (1) bears the imprimatur of the school, and (2) occurs in a curricular activity." Bannon, 387 F.3d at 1214.

In the present case, members of the public would reasonably perceive that the members of the KSU Cheerleading Squad – including those (like Plaintiff) who knelt and those who stood at attention during the National Anthem – bear the imprimatur of KSU within the meaning of the Hazelwood standard, because they were wearing uniforms emblazoned with KSU's name, were on the field for a KSU football game, are supervised by a KSU official, and because a fundamental purpose of the KSU Cheerleading Squad is to increase school spirit during such KSU functions. See, e.g., McCann v. Fort Zumwalt Sch. Dist., 50 F. Supp. 2d 918, 923 (E.D. Mo. 1999) (finding school marching band performance of song at football game bore the imprimatur of the school because they wore uniforms bearing school colors, were transported to and from

---

[20] Plaintiff acknowledges that Kaepernick's kneeling during the National Anthem, which apparently inspired her to follow suit, "drew angry disapproval," "invited loud disapproval," and "inflamed" the nation. (Compl., ¶¶ 10-11.)

games on district bus, and were announced as the school's marching band). In the specific context of cheerleading, the Fifth Circuit has found that expression by cheerleaders at school events is also governed by the <u>Hazelwood</u> standard.  <u>See</u> <u>Doe v. Silsbee Indep. Sch. Dist.</u>, 402 F. App'x 852, 853 (5th Cir. 2010) ("In her capacity as cheerleader" – which the court noted "she undertook voluntarily" – the plaintiff "served as a mouthpiece through which [the school] could disseminate speech;" as such, under <u>Hazelwood</u>, the school "had no duty to promote [the plaintiff's expression] by allowing her to cheer or not cheer, as she saw fit.").[21]

As to the reasonableness standard applied by <u>Hazelwood</u>, the Eleventh Circuit has explained that the standard is analogous to the reasonableness standard applied in non-public forum analysis:

> We fail to see how [the <u>Hazelwood</u>] standard differs from the [<u>Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.</u>, 473 U.S. 788, 806 (1985)] standard for non-public forums; instead it is merely an application of that standard to a curricular program. Since the purpose of a curricular program is by definition "pedagogical," the [<u>Cornelius</u>] standard requires that the

---

[21] Relevant to the <u>Hazelwood</u> analysis is that cheerleading involves a display of skills to those attending football games and other school functions, as the cheerleaders perform routines and cheers requiring skill and practice and intended to incite school spirit. <u>Cf.</u> <u>Bannon</u>, 387 F.3d at 1215 (school's beautification project held to satisfy <u>Hazelwood</u> standard where "designed to impart particular knowledge and skills to student participants and audiences; it allowed student participants to express themselves artistically, allowed student audiences to appreciate their fellow students' artwork, and promoted school spirit, among other things.").

> regulations be reasonable in light of the pedagogical purposes of the particular activity. <u>Hazelwood</u> therefore does not alter the test for reasonableness in a non-public forum such as a school but rather provides the context in which the reasonableness of regulations should be considered.

<u>Searcey v. Harris</u>, 888 F.2d 1314, 1319 (11th Cir. 1989).

Thus, even if student speech standards applied to Plaintiff's expression, it is properly analyzed as school-sponsored speech because it bore the imprimatur of KSU. Moreover, because the KSU Defendants' conduct was both reasonable[22] in light of the pedagogical purposes of the KSU Cheerleading Squad and viewpoint neutral, it did not violate Plaintiff's First Amendment rights. For these reasons, and for those set forth in Sections B(3)(a) and (b) above, the KSU Defendants are entitled to qualified immunity – and therefore judgment on the pleadings – on the first prong of the two-prong analysis

---

[22] Also relevant to this analysis is the fact that precluding cheerleaders from being on the field during the National Anthem left them alternative channels for engaging in their speech. Indeed, Plaintiff does not contend that KSU failed to make available "free speech" zones or other designated public fora on its campus – not to mention public sidewalks and property adjacent to school property that are traditional public fora. <u>See</u> <u>Students for Life USA</u>, 162 F. Supp. 3d at 1239 (finding restriction of student speech in one part of campus reasonable in light of other fora available to student group both on and adjacent to campus). Plaintiff's preference to exploit her access to the KSU football field to engage in her speech is ultimately of little relevance. <u>See id.</u> at 1240 ("The plaintiff prefers to speak in the Perimeter, especially at the highly visible corner of Old Shell and University, but '[t]he First Amendment does not demand unrestricted access to a non-public forum merely because use of that forum may be the most efficient means of delivering the speaker's message.'"). <u>See also</u> <u>Cornelius</u>, 473 U.S. at 809.

as well.  See Grider, 618 F.3d at 1254 (the plaintiff must satisfy "[b]oth elements of [the two-pronged analysis] for the [defendant] to lose qualified immunity.").

## CONCLUSION

The KSU Defendants are entitled to qualified immunity (1) because their as alleged were within their discretionary authority as KSU president and athletic department officials, (2) because Plaintiff is unable to show either (a) that she had a clearly established First Amendment right to kneel during the National Anthem on the KSU football field – a forum she only had access to due to her status as a member of the KSU Cheerleading Squad – while in formation with her fellow cheerleaders and wearing her KSU uniform identifying her as an official member of the KSU Cheerleading Squad or (b) that it was clearly established that implementing a change to the pre-game run-of-show resulting in all members of the KSU Cheerleading Squad – both those who stood at attention and those who knelt during the National Anthem at the earlier game – would violate that First Amendment right; and (3) because Plaintiff is unable to show that any action allegedly taken by the KSU Defendants violated her First Amendment rights in any way.

*[SIGNATURES ON NEXT PAGE]*

Respectfully submitted, this the 5th day of March, 2019.

> _s/ R. Read Gignilliat_
> R. Read Gignilliat
> Georgia Bar No. 293390
> Timothy J. Holdsworth
> Georgia Bar No. 730986

ELARBEE, THOMPSON, SAPP & WILSON, LLP
800 International Tower
229 Peachtree Street, N.E.
Atlanta, Georgia 30303
(404) 659-6700
(404) 222-9718 (Facsimile)
gignilliat@elarbeethompson.com
holdsworth@elarbeethompson.com

_Attorneys for Defendants Samuel S. Olens,_
_Scott Whitlock, and Matt Griffin_

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned counsel hereby certifies, pursuant to Local Rule 7.1D, N.D.Ga.,

that the foregoing **MEMORANDUM IN SUPPORT OF DEFENDANTS OLENS,**

**WHITLOCK, AND GRIFFIN'S MOTION FOR JUDGMENT ON THE**

**PLEADINGS** was prepared in accordance with Local Rule 5.1, N.D.Ga. using Times

New Roman font, 14 point.

Respectfully submitted, this the 5th day of March, 2019.

*s/ R. Read Gignilliat*
R. Read Gignilliat
Georgia Bar No. 293390

ELARBEE, THOMPSON, SAPP & WILSON, LLP
800 International Tower
229 Peachtree Street, N.E.
Atlanta, Georgia 30303
(404) 659-6700
(404) 222-9718 (Facsimile)
gignilliat@elarbeethompson.com

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| TOMMIA DEAN, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | CIVIL ACTION FILE NO.: |
| v. | ) | 1:18-cv-04224-TCB |
| | ) | |
| SAMUEL S. OLENS, et al., | ) | |
| | ) | |
|     Defendants. | ) | |

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have on this date electronically filed the foregoing

**MEMORANDUM IN SUPPORT OF DEFENDANTS OLENS, WHITLOCK,**

**AND GRIFFIN'S MOTION FOR JUDGMENT ON THE PLEADINGS** with

the Clerk of Court using the CM/ECF system which will automatically send

notification of such filing to all counsel of record.

Respectfully submitted, this the 5th day of March, 2019.

*s/ R. Read Gignilliat*
R. Read Gignilliat
Georgia Bar No. 293390

ELARBEE, THOMPSON, SAPP & WILSON, LLP
800 International Tower
229 Peachtree Street, N.E.
Atlanta, Georgia 30303
(404) 659-6700

(404) 222-9718 (Facsimile)
gignilliat@elarbeethompson.com