## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

TOMMIA DEAN,

 Plaintiff,

v.

SAMUEL S. OLENS, EARL
EHRHART, NEIL WARREN, SCOTT
WHITLOCK and MATT GRIFFIN,

Defendants.

CIVIL ACTION
FILE NO.: 1:18-cv-04224-TCB

## PLAINTIFF'S RESPONSE TO DEFENDANTS'
## MOTION FOR JUDGMENT ON THE PLEADINGS

Plaintiff Tommia Dean files this Response to the Motion for Judgment on the Pleadings filed by Defendants Olens, Whitlock and Griffin (Doc. 38).

### A.   THE PLEADINGS AND THE IQBAL/TWOMBLY STANDARD

The United States Supreme Court in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), while clarifying that conclusory language cannot alone support a complaint, reaffirmed the fundamental principles of Rule 8 of the Federal Rules of Civil Procedure: "when a complaint adequately states a claim, it may not be dismissed on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations." *Id.* at 564, n. 8.

1

In *Barker ex rel. United States v. Columbus Regional Healthcare System, Inc.*, 977 F.Supp.2d 1341 (M.D. Ga. 2013), Judge Land expressed skepticism that *Twombly and Iqbal* had modified Rule 8 by judicial fiat: "many lawyers fail to appreciate the distinction between determining whether a claim for relief is 'plausibly stated,' the inquiry required by *Twombly/Iqbal*, and divining whether actual proof of that claim is 'improbable,' a feat impossible for a mere mortal." *Id.* at 1346.

The *Iqbal* case expanded the principles of *Twombly* beyond antitrust litigation to all civil cases and stated: "the pleading standard Rule 8 announces does not require detailed factual allegations, but it demands more than an unadorned, the defendant - unlawfully - harmed - me accusation." 556 U.S. 662, 677-678.

The Supreme Court has also reminded courts, with respect specifically to the summary adjudication of qualified immunity defenses, that *Iqbal* and *Twombly* do not overcome the presumptions to which the plaintiff is entitled or permit district courts to substitute their judgment for the judgment of the jury.  In *Tolan v. Cotton*, 572 U.S. 650 (2014), a unanimous Supreme Court took the highly unusual step of summarily reversing the Fifth Circuit, which had affirmed summary judgment for defendants on the issue of qualified immunity:

> Our qualified-immunity cases illustrate the importance of drawing inferences in favor of the nonmovant, even when, as here, a court decides only the clearly-established prong of the standard. In cases

> alleging unreasonable searches or seizures, we have instructed that
> courts should define the "clearly established" right at issue on the
> basis of the "specific context of the case." . . .  Accordingly, courts
> must take care not to define a case's "context" in a manner that
> imports genuinely disputed factual propositions.
> See *Brosseau, supra,* at 195, 198, 125 S.Ct. 596 (inquiring as to
> whether conduct violated clearly established law " 'in light of the
> specific context of the case' " and construing "facts ... in a light most
> favorable to" the nonmovant).

(Citations omitted).  The Court's observations in *Tolan* apply with even greater

force here, where Defendants carry a much heavier burden than do movants for

summary judgment.

    In their Motion for Judgment on the Pleadings, Defendants Samuel Olens

("Olens"), Matthew Griffin ("Griffin") and Scott Whitlock ("Whitlock") (

collectively "KSU Defendants") don't actually accuse Plaintiff of filing an

"unadorned, the defendant unlawfully-harmed-me accusation." They could not

plausibly do that. Plaintiff, in response to the Earhart Motion to Dismiss made

more than two dozen references to concrete factual assertions in support of her

Complaint. (Doc. 32). These are incorporated herein by reference. The record also

contains the KSU Defendants' Answer and numerous attached exhibits, (Doc. 33),

which provides substantial additional factual support for Plaintiff's allegations.

This evidence is discussed below.

    This is not a threadbare Complaint, reciting by rote the elements of a cause

of action. The pleadings are rich with compelling detail. When the admissions and

additional material supplied by the Answer are also considered, a narrative far beyond "plausible" appears.

The KSU Defendants' Answer repeatedly denies that these Defendants' actions in removing Plaintiff from the field during the national anthem were anything more than choreography (¶¶ 20, 21, 23, 24, 26, 27, 37, 39 and the Third Affirmative Defense). A reasonable fact-finder would ask, based only on the pleadings, why was no mention made of this in Olens' November 17 letter in which he relented and allowed the cheerleaders, including Plaintiff, back on the field during the national anthem? Only her First Amendment rights to kneel were referenced. Why was the author of the report from the Board of Regent's Office of Legal Affairs skeptical about the stated reasons for the change? If the Defendants' purposes were merely logistical, why didn't Olens seek the University Sytems's approval for the change in the pre-game show as directed?  Why did Earhart and Warren claim they had to "drag" or "push" Olens if the change was only related to entertainment?

These are matters that require discovery. There is a plausible contradiction on the face of the pleadings regarding the true motives for pulling Plaintiff off the field during the anthem, and it is also plausible that the reasons now stated by KSU Defendants are pretext.

The case involves the odd spectacle of the KSU Defendants claiming qualified immunity for actions they claim they did not do, *i.e.* take the cheerleaders

off the field during the anthem for reasons other than to improve the fan experience.

If a fact-finder found pretext in the KSU Defendants moving Plaintiff and others to a tunnel during the anthem, this would be supportive of the admonition in *Malley v. Briggs*, 475 U.S. 335, 341 (1986),  that an official has no right to claim qualified immunity if he "knowingly violates the law." Olens repeatedly agreed in the past that the cheerleaders had a right to kneel during the anthem, including in his November letter to the KSU community and in his interview with the investigator from the Office of Legal Affairs. If he and the other KSU Defendants dissembled and used pretext to deprive Plaintiff of her Constitutional right to kneel in prayer and protest, the evidence is more than plausible that this was done to knowingly violate the law for political or personal reasons.

As discussed below in Part B, the KSU Defendants' Motion should be denied for the threshold reason that they have not established, on the pleadings, that they are even eligible to claim the qualified immunity defense by having the necessary discretionary authority to keep the cheerleaders off the field.  In Part C, Plaintiff will show that the qualified immunity defense does not apply because Olens acknowledged, in writing, that he knew keeping the cheerleaders off the field would violate the First Amendment.  In Part D, Plaintiff will explain that, in any event, the law has been "clearly established" for decades that schools may not suppress student speech on the basis of the viewpoint espoused.

## B.     DISCRETIONARY AUTHORITY

The case that created the qualified immunity doctrine, *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982), limited qualified immunity to "discretionary" acts by the official.  The Eleventh Circuit requires a public official to prove he had discretionary authority to act in order to claim qualified immunity. *Storck v. City of Coral Springs*, 354 F.3d 1307, 1314 (11th Cir. 2003). "If [public officials] are not acting within their discretionary authority they are not eligible for qualified immunity." *Lumley v. City of Dade City*, 327 F.3d 1186, 1194 (11th Cir 2003). Thus, the KSU Defendants and not the Plaintiff have the burden on this point even though the case is only at the pleadings stage.

These principles were addressed in the case cited by the KSU Defendants, *Hutton v. Strickland*, 919 F.2d 1531, 1537 (11th Cir.  1990). The Hutton court engaged in a two-part analysis of discretionary authority requiring (a) actions taken in the performance of the official's duties; (b) actions within the scope of the official's authority.

The first point to make is that these two standards must be different or there would be no need for both. The first standard, "official's duties" is more general and reflects whether the action at issue was within the "bailiwick" of the official. There is no way to know on the face of the pleadings whether cheerleader choreography was within the job description of Olens, Whitlock or Griffin.  Their employment contracts or job description would provide valuable evidence on the

6

point, but Defendants did not attach them with the other exhibits. One plausible reason that Olens had to be pushed or dragged could have been that he did not believe he had authority to intervene and that this was a matter for the KSU Athletic Department. In any event, Olens, Whitlock and Griffin provided no concrete factual allegations to support an issue on which they have the burden at this stage.

The second standard, "scope of authority," is more fact specific and oriented toward context rather than general duties. On the face of the pleadings, there are ample and specific assertions that after the directive from Olen's superiors at the University System of Georgia to leave the cheerleaders on the field during the National Anthem, Olens had no authority to defy this directive and take the Plaintiff off the field. This could explain his use of the Athletic Department to solve a problem that did not exist and fill a two-minute lull that everyone thought had been addressed by other means. (*See* Report from Office of Legal Affairs, Exhibit 4 to Answer of KSU Defendants, Doc. 33-4).

Does the Plaintiff have to prove any of this at this stage? No. Are the factual allegations and admissions detailed and supportive of Plaintiff's position plausible? Absolutely. Do the KSU Defendants have the burden to prove discretionary authority? They do in the Eleventh Circuit and it is difficult to see how the KSU Defendants could possibly carry that burden on the pleadings.

## C.   QUALIFIED IMMUNITY DOES NOT APPLY BECAUSE DEFENDANTS HAD FAIR NOTICE

Defendant Olens is not entitled to qualified immunity because he had actual knowledge that keeping the cheerleaders off the field would violate the First Amendment.   (Doc. 33-5, page 4).  The purpose of the qualified immunity defense is to give government officials "notice" or "fair warning" that their conduct is unlawful before they are subjected to suit.  *Hope v. Pelzer*, 536 U.S. 730, 739 (2002); *Willingham v. Loughnan*, 321 F.3d 1299, 1301 (11th Cir. 2003). As the Supreme Court held in *Malley v. Briggs*, qualified immunity does not extend to "those who knowingly violate the law." 475 U.S. at 341.  In this case, Defendant Olens was given explicit notice that keeping the cheerleaders off the field would violate the First Amendment; he is not, therefore, entitled to the qualified immunity defense.  *Id.*

> Specifically, in Paragraph 20 of his Answer (Doc. 33), Olens states:
>
> [O]n October 2, 2017, Olens attended a meeting of the presidents of the University System of Georgia ("USG"), during which the University System Office staff related to the USG presidents, including Olens, that, pursuant to the First Amendment, students should not be prohibited from kneeling during the national anthem so long as the expression was not disruptive.

The KSU Defendants further attach to their answer the Report to the University of Georgia System Chancellor by the Office of Legal Affairs, which states on page 3 that "USG presidents were instructed that any institution changes related to the matter should be discussed with the University System Office prior to

implementation." (Doc. 33-5, page 4). Defendants further admit that Olens advised Ehrhart and Warren "that the cheerleaders had a First Amendment right to express themselves" by kneeling during the national anthem. (Doc. 33-5, page 4). The KSU Defendants attach to their Answer Olens' November 8, 2017, letter to the KSU community, in which Olens announces that the cheerleaders would be allowed back on the field during the national anthem. In the letter, Olens states: "While I believe there are more effective ways to initiate an exchange of ideas on issues of national concern, the right to exercise one's freedom of speech under the First Amendment must be protected." (Doc. 33-4).

On this record, *Plaintiff* is entitled to judgment that Defendants are not entitled to the qualified immunity defense because these pleadings show fair notice of the wrongfulness of keeping the cheerleaders off the field. Without doubt, Defendants' Motion should be denied.

### D.   QUALIFIED IMMUNITY: LAW CLEARLY ESTABLISHED

Even if Defendants had not been given fair notice, they still would not be entitled to the qualified immunity defense because the rights they allegedly violated were "clearly established" at the time. In their Motion, the KSU Defendants make two related arguments: first, that whatever rights the KSU Defendants violated were not "clearly established" (Doc. 38, page 11 through 18); second, that the KSU Defendants did not violate Plaintiff's constitutional rights at all (*id.,* page 18 – 25). Plaintiff will collapse her response to these two arguments

into a single discussion showing that (1) it is clearly established that the State may not suppress student speech for the sole reason of its viewpoint and (2) whether Defendant Olen and the others engaged in viewpoint discrimination is a question of fact that is not amenable to resolution at the pleading stage of the case.

> 1.  *It is clearly established that the state may not suppress speech on the basis of its message, ideas, subject matter, or content.*

It is "clearly established" that the government may not suppress speech on the basis of "its message, its subject matter, or its content." *Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 95–96 (1972).  *Any* restriction on expressive activity because of its content completely undercuts the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wise-open." *New York Times Co. v. Sullivan*,  376 U.S. 254, 270 (1964).  "The general principle that has emerged from this line of cases is that the First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others." *Members of City Council of City of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 804 (1984) (citing, among other cases, *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 65, 72 (1983); *Consolidated Edison Co. v. Public Service Comm'n*, 447 U.S. 530, 535–536 (1980); *Carey v. Brown*, 447 U.S. 455, 462–463 (1980).

The application of First Amendment principles in some cases depends upon the proper characterization of the "forum."   Viewpoint discrimination, however, is unconstitutional in any fora.  The forum in which the state has the most authority

to regulate speech is the nonpublic forum,[1] which "refers to property at which the government 'act[s] as a proprietor, managing its internal operations.'" *Barrett v. Walker Cty. Sch. Dist.,* 872 F.3d 1209, 1225 (11th Cir. 2017).   Even in a nonpublic forum, however, "the government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc*., 473 U.S. 788, 806 (1985).

That the government may not suppress speech because of its viewpoint applies with particular force in the school setting.  Thirty-six years ago, in 1983, the Supreme Court restated the law that had been clearly established *forty* years earlier in *Tinker:*

> In *Tinker v. Des Moines Independent Community School District, supra,* we held unconstitutional a decision by school officials to suspend students for wearing black armbands in protest of the war in Vietnam. The record disclosed that school officials had permitted students to wear other symbols relating to politically significant issues. *Id.,* 393 U.S., at 510, 89 S.Ct., at 738. The black armbands, however, as symbols of opposition to the Vietnam War, had been singled out for prohibition. We stated: "Clearly, the prohibition of expression of one particular opinion, at least without evidence that it is necessary to avoid material and substantial interference with schoolwork or discipline, is not constitutionally permissible." *Id.,* at 511, 89 S.Ct., at 739.

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 58 (1983).  In this case, with no evidence that "it is necessary to a avoid material and substantial

---

[1] Plaintiffs do not concede that a football game during the playing of the National Anthem is a "nonpublic forum."

interference with schoolwork or discipline," kneeling during the national anthem as a symbol of opposition to excessive use of force against African Americans, was "singled out for prohibition" in violation of the First Amendment.

In 1990, the Supreme Court summarized this clearly established law in *United States v. Kokinda,* 497 U.S. 720, 730 (1990)*:*

> Thus, the regulation at issue must be analyzed under the standards set forth for nonpublic fora: It must be reasonable and "not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry, supra,* 460 U.S., at 46, 103 S.Ct., at 955. Indeed, "[c]ontrol over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius, supra,* 473 U.S., at 806, 105 S.Ct., at 3451.

Indeed, the Defendants concede that this law is clearly established, that is, that the State may not suppress speech, including student speech, on the basis of viewpoint.   Defendants state in their Brief at page 20: "[T]he KSU football field was a non-public forum in which the KSU Defendants could restrict speech in a reasonable manner *and without viewpoint discrimination* without violating the First Amendment."  *See also* Brief at 21, note 19.  The issue Defendants' motion raises, therefore, is not a legal issue, for the law is clearly established, but a factual one: *whether* the KSU Defendants did in fact keep Dean off the field because of the viewpoint she was espousing.  To this argument Plaintiffs now turn.

2.      *On the facts: Pleadings Plausibly Allege Viewpoint Discrimination*

Defendants' primary defense is not on the law, but on the facts: implicitly acknowledging that viewpoint discrimination is clearly unlawful, they contend that their neutrality is proven by the fact that they kept all the cheerleaders off the field during the national anthem, not just Dean.   Brief at 20.  This argument is without merit for a number of reasons.

Initially, the argument is illogical: keeping all of the cheerleaders off the field does not disprove the allegation that the motivation of the KSU Defendants was to suppress the speech of the kneeling cheerleaders.  Even without the abundant evidence showing that the true motivation was to suppress speech, and not to "improve fan experience," a reasonable jury could infer that the KSU Defendants kept all the cheerleaders off of the field to suppress the speech of the kneeling cheerleaders.   This is *exactly* the inference that Defendant Warren made on these facts when he took credit for convincing Olens to keep the cheerleaders off the field to prevent them from kneeling during the national anthem.  In a text message to Ehrhart, Warren states: "'Not letting the cheerleaders come out on the field until after the national anthem was one of the recommendations that Earl [Ehrhart] and I have him [Olens].'" (Doc. 1, ¶ 29).

Defendants' argument requires the Court to accept, as a matter of fact, Defendants' pretextual explanation for keeping the cheerleaders off the field.  Even if the Defendants' narrative were not so wildly implausible, at this stage of the case

13

the Court is not permitted to make findings of fact, but instead must accept Plaintiff's allegations as true, allegations that far more plausibly explain that Defendants, yielding to the pressure exerted by Defendants Ehrhart and Warren, kept the cheerleaders off the field to suppress the speech of Dean and the other kneeling cheerleaders.  After detailing the hard evidence of the pressure Defendants Ehrhart and Warren were exerting, Plaintiff alleges: "The only purpose of making the change [in the pre-game ritual] was to appease Defendants Ehrhart and Warren." (Doc. 1, ¶ 24).  Plaintiff also alleges that: "Olens assured Warren that 'it would not happen again.' Specifically, Olens told Warren that the cheerleaders would not be on the field during the national anthem." (Doc. 1, ¶ 25).   Warren and Ehrhart had no interest in the pre-game ceremonies other than ensuring that the cheerleaders were prevented from kneeling during the national anthem.

Plaintiff's allegations must be accepted as true, but they are fortified by hard evidence – an unusually strong record given that discovery has not even begun. Text messages dated September 30, 2017, between Olens and his staff, attached to the Answer as Exhibit 1, reveal Olens' concern about cheerleaders kneeling during the anthem, which Olens described as "Not good,"; "Much fallout.  It will make the papers, downtown."  Olens then directed his staff to arrange immediate meetings with the cheerleader coach, band director and others.   (Doc. 33-1, page 5).  No mention is made in these texts as to any need to change the pre-game run of show because of a gap in the music.  Olens further admits that he took calls from

14

Warren, who repeatedly stated that cheerleaders should not be permitted to kneel during the national anthem.  (Doc. 33, ¶¶ 22, 25). Olens further admits that, after meeting with Defendant Griffin about the "change to the pregame run of show," he "told Warren that he need not worry about" the cheerleaders kneeling during the national anthem "because the cheerleaders would not be on the field during the national anthem."  (Doc. 33, ¶ 25).   The Office of Legal Affairs report states: "Though President Olens was aware of the implications of the run of show change, he did not advise the University System Office of the change prior to the game on October 7, 2017," as he had been instructed to do.  (Doc. 33-5, page 5).

The KSU Defendants admit that Defendants Warren and Ehrhart take credit for convincing Olens to prevent the cheerleaders from taking a knee by keeping them off the field.  (Doc. 33, ¶ 29).  The KSU Defendants further admit, and attach to their answer, a text message from Ehrhart to Warren in which Ehrhart states: "He [Olens] had to be dragged there but with you and I pushing he had no choice. Thanks for your patriotism my friend [.]"  (Doc. 33,  ¶ 29).

Against this overwhelming evidence, the KSU Defendants maintain that the purpose of the change to the pre-game run of show was to avoid an awkward two-minute gap in the pre-game music, not to prevent the cheerleaders from kneeling

15

during the national anthem.[2]  The Office of Legal Affairs Report expresses

skepticism as to this explanation for the change: "Their explanation is called into

question, however, by the timing of the change and the fact that those who noticed

the gap in pregame music in 2017 thought that it was remedied by other means."

(Doc. 33-5, at page 6).

In sum, Defendants have failed to carry their burden of showing, on the

pleadings, that they did not violate Plaintiff's clearly established constitutional

rights.

> 3.      *Cases involving completely different fact patterns are irrelevant*

The legal issues raised in this case, both with respect to qualified immunity

and the KSU Defendants' underlying liability, must be examined "'in light of the

specific context of the case.'" *Brousseau v. Haugen,* 543 U.S. 194, 198 (2004)

(citation omitted).  In this case, there is no university policy governing cheerleader

speech; there is no allegation that cheerleaders were kept off the field because of

any threatened disruption; there is no allegation that keeping the cheerleaders off

the field was related to any pedagogical concern.  Plaintiff either was kept off the

field to improve fan experience, as the KSU Defendants contend, or to suppress her

speech, as Plaintiff (and Warren and Ehrhart) contend.  Cases concerning any other

---

[2] Among many other questions raises by this explanation:  Why is the President of the University spending his valuable time meeting with the head of the Athletic Department to discuss a gap in pre-game music?

fact pattern are completely irrelevant.  Plaintiff will nevertheless address the cases briefly below.

KSU Defendants attempt to distract from the clarity of the law by citing cases featuring university policies that ban all speech in a particular limited or nonpublic forum.  *See Bloedorn v. Grube,* 631 F.3d 1218 (11th Cir. 2011), and *Students for Life USA v. Waldrop,* 162 F. Supp. 3d 1216 (S.D. Ala. 2016).  These cases are not remotely relevant: there are no university policies regulating speech by KSU cheerleaders; the KSU Defendants do not contend that Dean's speech was suppressed pursuant to any KSU policy; KSU policies, in fact, affirmatively support the rights of the cheerleaders to express themselves through symbolic speech.  In *Bluedorn*[3] and *Students for Life,*[4] there was no evidence of viewpoint discrimination; here, Plaintiff alleges, with substantial evidentiary support, that the KSU Defendants deliberately suppressed Dean's symbolic speech because of the viewpoint that Dean was espousing.

The KSU Defendants also cite various cases involving limitations on student *curricular* speech rights to promote "legitimate pedagogical concerns" or to

---

[3] *Bloedorn,* 631 F.3d at 1235 ("There is no record evidence suggesting . . . that the ban on outside, non-sponsored speakers in these areas is viewpoint-based; it applies equally to all outside, non-sponsored speakers.").  The Eleventh Circuit's opinion in *Bloedorn* broadly supports Plaintiff's position that the KSU Defendants' actions violated Plaintiff's clearly established constitutional rights.  In discussing the regulations at issue, the Court carefully considered whether the University's speech-permitting process gave officials too much discretion in determining whether to grant or deny a permit.  The Court observed: "In determining whether a permit policy is content based because it has granted an official 'unbridled discretion,' we examine first 'the purpose behind the regulation.'"  *Id.* at 1236.  In this case, there is no regulation, but the plain purpose of the KSU Defendants' actions was to prevent Dean and the other cheerleaders from kneeling during the national anthem – plain viewpoint-based discrimination.

[4] *Students for Life,* 162 F. Supp. 3d at 1240 ("the University's formal policy excludes all student expressive activitiy. . . . It therefore eliminates the possibility of viewpoint discrimination, since all viewpoints are banned").

maintain order and discipline.  In this case, however, there is no suggestion that banning the cheerleaders from the field had anything to do with any curricular instruction.  *Compare Hazelwood School Dist. v. Kuhlmeier,* 484 U.S. 260 (1988) (high school could censor contents of a high school newspaper produced as part of the school's journalism curriculum); *Bannon v. School Dist. of Palm Beach Cty.,* 387 F.3d 1208, 1217 (11th Cir. 2004) (finding that the school had a "legitimate pedagogical concern" in regulating what murals could be painted on school walls); *Denno v. School Board of Volusia Cty.,* 218 F.3d 1267, 1275 (11th Cir. 2000) (balancing student's rights against school's "interest in promoting civil discourse"); *McCann v. Ft. Zumwalt Sch. Dist.,* 50 F. Supp. 2d 918, 919 (E.D. Mo. 1999 at 919 (school not unreasonable in forbidding a marching band song that promoted illegal drug use).

In relying upon these cases, the KSU Defendants would have the Court accept a factual narrative that no party is advancing: that is, that the KSU Defendants kept Dean off the field pursuant to a (concededly nonexistent) policy governing symbolic speech of cheerleaders.  To grant the motion, the Court would have to go further and find that the (nonexistent) policy was narrowly tailored and "reasonably related to legitimate pedagogical concerns."  *Hazelwood*, 484 U.S. at 273.

The issue here is *not* whether constitutional law is clearly established for every fact pattern involving student speech, but whether it is clearly established for the facts of this case.  It is, and the Motion should be denied.[5]

This 19th day of March, 2019.

/s/ Randolph A. Mayer                    /s/ Bruce P. Brown
Randolph A. Mayer                        Bruce P. Brown
Georgia Bar No. 479350                   Georgia Bar No. 064460
Mayer & Harper, LLP                      Bruce P. Brown Law, LLC
50 Hurt Plaza SE, Suite 1640             1123 Zonolite Rd. NE, Suite 6
Atlanta, GA 30303                        Atlanta, GA 30306
(404) 584-9588                           (404) 881-0700

---

[5] The KSU Defendants incorporate by reference the argument advanced by Defendant Ehrhart that the kneeling by cheerleaders during the playing of the national anthem should be deemed "government speech."  That argument should be rejected for the reasons set forth by Plaintiff in response to Ehrhart's motion.  (Doc. 32).

19

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing Brief in Response to Defendants Motion

for Judgment on the Pleadings has been prepared in accordance with the font type

and margin requirements of LR 5.1, using font type of Times New Roman and a

point size of 14.

/s/ Bruce P. Brown
Bruce P. Brown
Georgia Bar No. 064460
Bruce P. Brown Law LLP
1123 Zonolite Rd. Suite 6
Atlanta, GA 30306
(404) 881-0700

## CERTIFICATE OF SERVICE

This is to certify that I have this day caused the foregoing Brief in Response to Defendants Motion for Judgment on the Pleadings to be served upon all other parties in this action by via electronic delivery using the PACER-ECF system.

This 19th day of March, 2019.

/s/ Bruce P. Brown
Bruce P. Brown
Georgia Bar No. 064460
Bruce P. Brown Law LLP
1123 Zonolite Rd. Suite 6
Atlanta, GA 30306
(404) 881-0700